Edward KERRIGAN and Lebera
Kerrigan, Plaintiffs-Appellees,

v.

J. W. ERRETT, Defendant-Appellant.

No. 2–58045.

Supreme Court of Iowa.

July 29, 1977.

Rehearing Denied Aug. 29, 1977.

B. A. Webster and Charles H. Dick, Jr., of Gamble, Riepe, Burt, Webster & Fletcher, Des Moines, for appellant.

Leo E. Gross and Eric F. Schwarz, of Thoma, Schoenthal, Davis, Hockenberg & Wine, Des Moines, for appellees.

Heard by MOORE, C. J., and RAWLINGS, LeGRAND, REYNOLDSON and McCORMICK, JJ.

REYNOLDSON, Justice.

Plaintiffs, Kerrigan and his wife Lebera, filed a petition alleging common-law negligence actions for personal injuries to Kerrigan and loss of consortium for Lebera against Kerrigan's employer, Firestone Tire & Rubber Company, and a Firestone executive, defendant J. W. Errett. These actions arose out of an industrial accident which occurred January 17, 1969. A prior appeal adversely disposed of the claim against Firestone. See *Kerrigan v. Firestone Tire & Rubber Company*, 207 N.W.2d 578 (Iowa 1973). Trial proceeded against Errett. Judgment was entered on jury verdicts in the amount of $178,500 for Kerrigan and $25,000 for Lebera. Upon defendant's appeal, we reverse and remand.

In January, 1969, Kerrigan was employed at Firestone's Des Moines plant. Among his duties was the operation of a 60-inch bladder press. This large machine was almost ceiling high. Other portions extended below floor level. The machine carried heavy forms to mold and cure rubber "bladders" under pressure and heat. A central core form weighing about a ton was attached to a vertical shaft. A collar was welded around the upper extremity of this shaft, and the collar in turn was welded with a continuous weld to a heavy plate cross member. Reloading of the press required the operator to insert his hands and arms between the molds and beneath the elevated core.

Kerrigan worked the "C" shift, 3 p.m. to 11 p.m. Press operators on the two prior shifts had complained to shift supervisors and maintenance supervisors concerning unusual noises made by the machine and its appearance of not "hanging straight." No one used an available ladder to examine the topmost press components, nor did anyone tell Kerrigan of these events.

Shortly after Kerrigan arrived at the plant, he commenced the press reloading process. As he worked under the elevated core, he "heard a popping and a steam noise and it came down."

The weld holding the core shaft collar to the top plate failed. This caused the core to fall, amputating Kerrigan's right hand and the four fingers of his left hand.

Subsequent examination disclosed an old break to about 75 percent of the crucial weld. The remaining portion of the weld appeared to carry a "fresh break."

Under this record the jury could have found the hairline crack in the weld would have been visible under certain artificial lighting conditions and after removal of accumulated oil and dirt.

The petition alleged defendant Errett had "specific responsibilities concerning plant and employee safety" and alleged he committed certain specified acts of negligence.

Trial court submitted to the jury the single specification that Errett failed "to properly inspect, maintain, service and repair the bladder press being used by plaintiff."

Defendant, appealing, asserts trial court error in failing to direct a verdict for defendant at the close of evidence, failing to submit to the jury certain requested instructions and interrogatories, and in prohibiting cross-examination of Kerrigan to establish he was receiving workmen's compensation payments. Because our decision turns on the first alleged error, examination of the others is unnecessary.

I. Defendant contends his motion to direct verdict should have been granted because there was insufficient evidence that plaintiff relied upon defendant's discharge of a duty owed to their common employer for inspection, maintenance, service or repair of the press; insufficient evidence defendant owed plaintiff a personal duty; that as a matter of law the evidence disclosed defendant was too remote in point of responsibility to be liable, and that whatever responsibility he had was delegated to a subordinate, thereby relieving him of any direct duty or responsibility to plaintiffs.

These common-law negligence actions against Kerrigan's co-employee are bottomed on the rationale found in *Craven v. Oggero*, 213 N.W.2d 678 (Iowa 1973). See *Price v. King*, 259 Iowa 921, 146 N.W.2d 328 (1966); 2 Restatement (Second) of Torts § 324A, at 142 (1965); 2 Restatement (Second) of Agency § 354, at 125 (1958). In *Craven* we affirmed judgment against supervisory employees and in favor of the estate of an employee whose death resulted from a breach of duty owed by the defendant supervisory employees to their subordinate. It should be noted parenthetically that by statutory amendment enacted subsequent to both the *Craven* accident and the events of this case the legislature has provided a limited liability immunity for a co-employee. § 85.20, The Code, 1977; see Acts 65 G.A. ch. 1111, § 1 (1974).

Two supervisory co-employees were held liable in the *Craven* case. Safety director Oggero had the duty to tour job sites to inspect for safety hazards. He acknowledged at trial he had an obligation to inspect the bridging device which caused the disaster, but did not inspect. Job superintendent Reeves testified he knew the plyboard bridging platform did not have guardrails and toeboards as required by rule of the Iowa Employment Safety Commission. He admitted he had the opportunity and duty to correct the situation if the platform was unsafe, but did nothing.

In *Craven* the supervisory employees were on-the-scene and not remote management personnel. Each had been delegated a first-hand, direct and personal duty to inspect the situation and device which caused the fatality.

In this case Kerrigan's brief concedes Errett was not charged with the responsibility of personally inspecting the defective press. Rather, it is claimed he had been delegated, and had accepted, the duty to formulate a policy for safety inspections after a complaint by an employee, as well as inspections on a regular and periodic basis. Kerrigan asserts such inspections would have disclosed the cracked weld. No issue has been raised here that this claimed negligence was not encompassed within the specification of negligence upon which the case was submitted to the jury.

Defendant Errett's brief concedes the industrial relations department of which he was manager had specific responsibility for inspecting installation of new machinery for safety features, inspections for unsafe practices or observable conditions, and inspection of safety showers and eyewash fountains. But Errett insists maintenance and inspection for structural and mechanical problems in production equipment was an exclusive responsibility of the plant engineer and his maintenance department.

■ A corporation, being a fictitious entity, necessarily advances its objectives and purposes only through efforts of its officers, agents and employees. See *Ashland v. Lapiner Motor Company*, 247 Iowa 596, 601, 75 N.W.2d 357, 360 (1956). But where in the progress of corporate operations negligence causes injury to a third person, or, as here, to an employee before the statutory change, it is obvious that not all corporate employees become liable. In our examination of the alleged liability of Errett, we must necessarily determine the perimeters of potential liability.

■ In *Craven* we referred to a "personal duty" assigned to the co-employees held liable. 213 N.W.2d at 682. The general rule imposes personal liability on a co-employee only upon neglect or violation of a "duty with which he is personally charged." See 57 C.J.S. Master and Servant § 578, at 349 (1948) and cases cited, n. 30.

■ We now adopt those criteria for imposing individual liability on a co-employee found in *Canter v. Koehring Company*, 283 So.2d 716, 721 (La.1973):

"1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.

2. This duty is delegated by the principal or employer to the defendant.

3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances—whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care ·in discovering and avoiding such risk of harm which has resulted from the breach of the duty.

4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm."

The Minnesota supreme court followed the *Canter* criteria in *Dawley v. Thisius*, 304 Minn. 453, 456, 231 N.W.2d 555, 557–558 (1975):

"The acts of negligence for which a co-employee may be held liable must be acts constituting direct negligence toward the plaintiff, tortious acts in which he participated, or which he specifically directed others to do. *Steele v. Eaton*, 130 Vt. 1, 285 A.2d 749 (1971). A co-employee may be held liable when, through personal fault as opposed to vicarious fault, he breaches a duty owed to plaintiff. Personal liability, however, will not be imposed on a co-employee because of his general administrative responsibility for some function of his employment without more. He must have a personal duty towards the injured plaintiff, breach of which has caused plaintiff's damage. *Canter v. Koehring Co.*, 283 So.2d 716 (La.1973); accord, *Wilson v. Hasvold*, 86 S.D. 286, 194 N.W.2d 251 (1972)."

II. In application of the above criteria we must examine the record to determine whether Kerrigan produced sufficient evidence to support a necessary and underlying jury finding that personal duties for Kerrigan's safety were assigned to and accepted by Errett. The general rules for reaching this decision have been recently articulated and will not be repeated here. See *Prestype Inc. v. Carr*, 248 N.W.2d 111, 118–119 (Iowa 1976); *Becker v. D & E Distributing Co.*, 247 N.W.2d 727, 729–730 (Iowa 1976).

Errett's college degree was in education. He was employed by Firestone in 1942, and for 31 years preceding the relevant events in this case had functioned in the area of industrial relations. He was manager of that department in the Des Moines plant. He spent much of his time in negotiating and interpreting union contracts and in grievance proceedings.

The written specification for Errett's position (job description) was put in evidence. It disclosed his immediate supervisor was the plant manager. The specification states the person holding this position, "Supervises and oversees subordinates in the operation and administration of the following departments: Medical, Safety, Plant Protection, Plant Newspaper & Public Relations, Group Insurance, Food Service, Training, Suggestions." The industrial relations manager "Develops policies and pro-

cedures relative to employee discipline, plant safety, plant protection, time study, etc., within the limitations of Company policy, Union contracts and applicable laws and government regulations." Qualifications for this position are a college degree (no engineering required) with previous experience in "Methods of Standards, Factory Employment, Training, or other Industrial Relations staff work."

Apparently the "safety" department comprised one subordinate, safety engineer Main. Main was not a mechanical engineer either, but was selected for this position on the basis of his educational background in industrial psychology and several years experience in plant safety.

The safety engineer's position specification is also in evidence. It indicates one holding this position is to spend 20 percent of his time in inspection:

"A.  *Inspection*                                           20%
1.  Makes inspections of buildings, machinery, and operations relative to unsafe practices, making recommendations as needed. (Daily)
2.  Inspects installations of new equipment, consulting with engineers and department managers. (Daily)
3.  Recommends changes in equipment or facilities to eliminate unsafe conditions. (Weekly)
4.  Recommends protective devices and equipment. (Weekly)
5.  Investigates suggestions submitted pertaining to safety. (Weekly)"

With exceptions hereafter noted, Main was expected to concern himself with the "human" aspects of safety—attempting to eliminate observable "unsafe practices" as opposed to inspections to avoid basic mechanical failures. Normally, his general policy guidelines came directly to him from the head corporate safety officer in Akron, Ohio, with a copy to the industrial relations manager at the plant.

Main's involvement with the installation of new equipment was in the employee's immediate work area—the hand tools he used, parts of the equipment he might control with his hands, guards, safety switches, eye guards and other personal safety precautions. There was no evidence he had any responsibility for the internal inspection of new equipment, its construction, design installation, or subsequent inspection.

Firestone policy required mandatory periodic inspections of designated equipment. Responsibility for this inspection was designated by directives from Firestone's headquarters. The Administration Manual in evidence did not make reference to the bladder press, but did show inspection responsibility for similar production equipment was placed in the maintenance department. Written company policy gave the plant engineer "[r]esponsibility for engineering specifications, designs, construction, maintenance and utilities." The safety department was delegated inspection responsibility for safety showers and eyewash fountains, both non-production devices.

The evidence was overwhelming the established procedure with respect to a production equipment problem was that followed by the two shift workers who preceded Kerrigan on the bladder press: a complaint to the immediate supervisor, then to the shift foreman, then to the maintenance department which functioned under the plant engineer. Kerrigan testified when something went wrong with a machine it was his practice to call his supervisor and "he calls maintenance and they fix it." He never complained to the industrial relations manager or the safety engineer when a piece of machinery malfunctioned.

There was strong and direct evidence neither Errett nor Main had any company-imposed responsibility for the original installation of the core shaft on the bladder press, for the design criterion for the welded joint which failed, for a continued inspection of the weld, for requiring the plant engineer or his maintenance department to inspect the shaft and weld, or for requiring the engineer's maintenance employees to so inspect. There was strong and direct evidence this was the responsibility of the plant engineer and his maintenance department.

Nonetheless, attempting to place these responsibilities at Errett's door, Kerrigan relies almost exclusively on the imprecise language of the job specifications, supra, and on a portion of Errett's deposition. These deposition questions and answers are considered so crucial by Kerrigan they are set out twice (five pages apart) in his brief:

"Q. * * * What I want to know, if you know, is on a given piece of equipment was there any procedure for periodic inspections of that equipment for the safety of the employees? A. Not by the safety engineer.

"Q. Or by you? A. Or by me.

"Q. Did you have the authority to do that? A. Yes. We had the authority to inspect a piece of equipment, a work method, at any time we chose.

"Q. At all times here you and [sic, as] the manager of the Industrial Relations Department could have established rules and regulations for the periodic inspection of machinery; could you not? A. Yes. At that time I was his supervisor and anything I desired we would have done."

A logical interpretation of this testimony would convince us Errett was referring to an inspection safety engineer Main was capable of conducting—one relating to working procedures and conditions around a given machine, not relating to structural weakness in the unit.

■ Even viewed in the light most favorable to Kerrigan, as we must, we do not believe this skimpy evidence generates an inference upon which reasonable minds could differ that Errett was delegated, and had accepted, a personal duty to formulate inspection procedures and policies to reveal physical weaknesses in the components of production-line equipment.

We view this testimony only as an acknowledgment of *authority*, not *duty*. Duty denotes an obligation; it is compulsory. Authority denotes capacity; it is permissive. Under the criteria we adopt, supra, it is important to distinguish between the two. Whether Errett had the capacity to impose inspection procedures for structural inspections is irrelevant if he had no obligation to do so.

The above testimony neither acknowledges an obligation to mandate inspections which would have disclosed the fractured weld, nor an acceptance of any such responsibility. Nor do we believe the job specifications impose such a personal duty. Giving Errett overall supervision of the one-man "safety" department is hardly sufficient to charge him with such a specific task. The safety engineer's job specification restricts his operating machinery inspections to "unsafe practices."

Inspection forms were provided by corporate headquarters for machines similar to the bladder press. It seems obvious that drafting procedures and specifications for structural inspections would be delegated to trained mechanical, electrical, or steam engineers. This was not a qualification for either Errett's or Main's job—a plain company signal they had no duties relating to the inspection procedures Kerrigan would impose on them.

It may well be that other co-employees had company-imposed personal duties, the violation of which caused Kerrigan's injury. But as a matter of law we are convinced the evidence does not generate a jury issue relating to Errett's responsibility. In this, we believe Errett occupies the same position as the president, project manager, and superintendent absolved from liability by the New Jersey court in *Miller v. Muscarelle*, 67 N.J.Super. 305, 334–339, 170 A.2d 437, 452–454 (1961), a decision this court relied on in *Craven*, supra, 213 N.W.2d at 682.

There is no evidence from which the jury could reasonably find Errett "undertook" any obligations relative to the type of inspections which would be material in the case before us. See 2 Restatement (Second) of Torts § 324A, at 142; 2 Restatement (Second) of Agency § 354, at 125. See also *Moya v. Warren*, 88 N.M. 565, 567, 544 P.2d 280, 282 (1975) ("To 'undertake' [in § 324A, Restatement (Second) of Torts] means 'take upon oneself solemnly or expressly: put oneself under obligation to perform: contract, covenant * * * guarantee, promise.' Webster's Third New International Dictionary, Unabridged (1966) at 2491.").

Our above holding makes it unnecessary to consider the other issues raised by Errett.

We reverse and remand for entry of judgment for the defendant.

REVERSED AND REMANDED.