919 P.2d 263

**Barbara IDDINGS, Plaintiff–Appellant,**

v.

**Dennis MEE–LEE, Defendant–Appellee.**

**No. 17877.**

Supreme Court of Hawai'i.

June 20, 1996.

Francis T. O'Brien of Ashford & Nakamura, on the briefs, Honolulu, for plaintiff-appellant Barbara Iddings.

Richard K. Quinn and Timothy I. MacMaster, on the briefs, Honolulu, for defendant-appellee Dennis Mee–Lee, M.D.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

In this case, dealing with the scope and requirements of the statutory "wilful[ 1] and wanton misconduct" exception to the co-employee immunity provisions of Hawai'i's workers' compensation scheme, Hawai'i Revised Statutes (HRS) chapter 386, plaintiff-appellant Barbara Iddings appeals from the

---

**1.** The term "wilful" has two accepted spellings, "wilful" and "willful." *See The American Heritage Dictionary* 922 (3d ed.1994). Both spellings are used in the text of this opinion interchange-ably, and the use of one spelling in one location in the text and the use of the other spelling in another location in the text is not meant to denote different meanings.

First Circuit Court's grant of summary judgment in favor of defendant-appellee Dennis Mee–Lee, M.D. Iddings, a nurse in the Intensive Care Module of Castle Medical Center's (CMC) Human Services Unit, suffered injuries while she assisted other CMC staff members in subduing a violent patient. Iddings asserted that Dr. Mee–Lee, who was in charge of the Human Services Unit, engaged in "wilful and wanton misconduct" by allegedly allowing the Intensive Care Module to become overcrowded with patients and furniture, despite being aware of a risk of injury stemming from the alleged overcrowding.

On appeal, Iddings contends that the circuit court erred in granting Dr. Mee–Lee's motion for summary judgment because: (1) Dr. Mee–Lee could not be found to have engaged in "wilful and wanton misconduct" insofar as Iddings did not allege that Dr. Mee–Lee acted with an intent to injure Iddings; and (2) Hawai'i's workers' compensation scheme provided the exclusive remedy for her injuries.

█ We hold that the circuit court erred in granting Dr. Mee–Lee's motion for summary judgment because an actual intent to injure is not required in order for the injury-causing conduct of a co-employee to fall within the scope of the "wilful and wanton misconduct" exception of HRS § 386–8 (1993).[2] We therefore vacate the circuit court's order granting Dr. Mee–Lee's motion for summary judgment and remand this case for further proceedings.

## I. BACKGROUND

At the time of Iddings's injuries, both Iddings and Dr. Mee–Lee were employed by the CMC. Dr. Mee–Lee was the Director of Psychiatry at the CMC and was in charge of the Human Services Unit. Iddings worked in the Human Services Unit as a psychiatric nurse. While on duty on October 12, 1991, Iddings assisted several CMC staff members in subduing a violent patient in the Human Services Unit. During the fracas, Iddings was thrown to the floor, became wedged between pieces of furniture, and suffered injuries to her head, neck, back, and knee.

After the incident, complaining of headaches, Iddings was hospitalized from November 1 to 5, 1991, and later received physical therapy for her neck, back, and knee injuries. Iddings applied for, and received, workers' compensation benefits for medical care and wage loss associated with her injuries.

On August 12, 1992, Iddings, who now resides in Virginia, filed a complaint in the First Circuit Court against Dr. Mee–Lee, alleging, *inter alia,* that: (1) Dr. Mee–Lee was an independent contractor; and (2) Dr. Mee–Lee, by allowing the CMC's Human Services Unit to become overcrowded with patients, acted both negligently and wilfully and wantonly in creating an unsafe work environment that caused the Intensive Care Module to become cluttered with furniture in order to accommodate the patients. The pertinent portions of the complaint specifically alleged that:

4. Upon information and belief, Defendant MEE–LEE is and was at all times material herein the Director of Psychiatry at Castle Medical Center. Upon further information and belief, Defendant MEE–LEE provided said services to Castle Medical Center as an independent contractor.

. . . .

8. On or about October 12, 1991, Plaintiff IDDINGS was on duty as a psychiatric nurse within the Human Services Unit. At the above-described time and place, it was necessary for plaintiff, as a part of her duties, to enter the Intensive Care Module to subdue a violent patient.

9. In the course of subduing said patient, Plaintiff was injured as she was shoved against furniture which was within the Intensive Care Module in order to accommodate the overcrowded conditions within the unit.

10. Prior to October 12, 1991, Defendant MEE–LEE had been advised that excessive furniture within the Intensive Care Module posed a safety hazard, but

---

2. HRS § 386–8 provides in pertinent part that "[a]nother employee of the same employer shall not be relieved of his [or her] liability as a third party, if the personal injury is caused by his [or her] wilful and wanton misconduct."

Defendant MEE–LEE took no steps to remove the furniture or to reduce the patient population within the Intensive Care Module.

11. Defendant had the ability to control the patient population, as was evidenced by the fact that he caused said population to be reduced to within authorized numbers in anticipation of a hospital accreditation inspection, and, again, in anticipation of an inspection by the State Department of Health.

12. The actions of Defendant MEE–LEE in failing to take steps to provide for the safety of plaintiff IDDINGS and other staff members who were required to work within the Intensive Care Module with individuals who often were hostile and/or violent constituted negligence and/or willful and wanton misconduct on the part of Defendant MEE–LEE.

Subsequent discovery revealed that, at all times pertinent to the complaint, Dr. Mee–Lee had been an employee of the CMC and was not an independent contractor. Recognizing that her negligence claims against Dr. Mee–Lee would therefore be barred by the exclusive remedy provisions of HRS § 386–5 (1985),[3] Iddings stipulated to dismiss her negligence claims against Dr. Mee–Lee with prejudice on November 5, 1993. However, the claims that were based upon Dr. Mee–Lee's alleged willful and wanton misconduct were preserved. The stipulation for partial dismissal provided in pertinent part that "[a]ll claims that Plaintiff Barbara Iddings was injured as a result of Defendant Dennis Mee–Lee's alleged 'willful and wanton misconduct' remain. The phrase 'willful and wanton misconduct' is used in this Stipulation in the same manner in which it is used in HRS § 386–8 and shall be interpreted accordingly."

On January 3, 1994, Dr. Mee–Lee filed a motion for summary judgment: (1) contending that Iddings's allegation that Dr. Mee–Lee intentionally allowed her to work in an unsafe working environment "is not sufficient to constitute the type of 'wilful and wanton misconduct' which is required to circumvent the exclusive remedy provision" of HRS § 386–5; and (2) asserting that "proof of an actual intent to injure is required to circumvent the exclusive remedy provision[.]" The circuit court agreed and granted Dr. Mee–Lee's motion by order filed February 8, 1994. This timely appeal followed.

## II. STANDARD OF REVIEW

On appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Heatherly v. Hilton Hawaiian Village Joint Venture*, 78 Hawai'i 351, 353, 893 P.2d 779, 781 (1995) (brackets, quotation marks, and citations omitted).

## III. DISCUSSION

A. *The Exclusivity Provisions of Hawai'i's Workers' Compensation Scheme and the "Wilful and Wanton Misconduct" Exception to Co–Employee Immunity*

As a general rule in Hawai'i, workers' compensation is an injured employee's exclusive remedy for an injury arising out of and in the course of employment. HRS § 386–5 provides in pertinent part that "[t]he rights and remedies herein granted to an employee or the employee's dependents on account of a work injury suffered by the employee *shall*

---

3. HRS § 386–5 provided in pertinent part:

**Exclusiveness of right to compensation.** The rights and remedies herein granted to an employee or the employee's dependents on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee, the employee's legal representative, spouse, dependents, next of kin, or anyone else entitled to recover damages from the employer, at common law or otherwise, on account of the injury.

*exclude all other liability of the employer* to the employee[.]" *Id.* (emphasis added); *see also Coates v. Pacific Engineering,* 71 Haw. 358, 362, 791 P.2d 1257, 1259–60 (1990) ("The Hawaii State Legislature, by enacting the exclusivity provision, intended that our Workers' Compensation system be the exclusive remedy for work-related injuries and deaths." (Citation omitted.)).

HRS § 386–8, in like manner, extends immunity from suit to an injured worker's co-employees. HRS § 386–8 provides in pertinent part that:

> When a work injury for which compensation is payable under this chapter has been sustained under circumstances creating in some person other than the employer *or another employee of the employer acting in the course of his [or her] employment a legal liability to pay damages* on account thereof, the injured employee or his [or her] dependents ... may claim compensation under this chapter and recover damages from such third person.

(Emphasis added.) HRS § 386–8 also provides, however, that "[a]nother employee of the same employer shall not be relieved of his [or her] liability as a third party, if the personal injury is caused by his [or her] wilful and wanton misconduct." *See also Hirasa v. Burtner,* 68 Haw. 22, 25, 702 P.2d 772, 775 (1985) (holding that "[i]f HRS § 386–8 allows an injured employee to file a direct action against his [or her] co-employee for wilful and wanton misconduct, then logically a third-party plaintiff who is not a co-employee should also have the right to implead the wilful and wanton misconduct of the injured worker's co-employee. In both instances, the liability for injuries sustained in the accident is allegedly due to the wilful

and wanton misconduct of the injured worker's co-employees.").

**B.** *Hawai'i's "Wilful and Wanton Misconduct" Exception To Co–Employee Immunity Does Not Require An Intent to Cause Injury in Order to Apply*

Iddings asserts that the trial court erred in granting summary judgment against her and in favor of Dr. Mee–Lee because the "wilful and wanton misconduct" exception to co-employee immunity, pursuant to HRS § 386–8, does not require proof that the injuring co-employee possessed a specific intent to cause injury to the injured co-employee in order to apply. We agree for three reasons: (1) the plain meaning of the words used in the term "wilful and wanton misconduct" includes reckless conduct that does not require a specific intent to cause injury within its scope; (2) allowing suits between co-employees based on reckless conduct does not contravene or undermine the purpose of co-employee immunity in Hawai'i's workers' compensation scheme, or the purposes underlying workers' compensation in general; and (3) the scope of Hawai'i's uniquely phrased exception to co-employee immunity more closely resembles the statutory schemes in other jurisdictions that exclude injuries caused by conduct that does not require a specific intent to cause injury than in those jurisdictions that include such injuries. We discuss each reason in turn.

**1. Plain Meaning.**

■ When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself.[4] *Pacif-*

---

4. For purposes of completeness, we note that the legislative history for the "wilful and wanton misconduct" exception to co-employee immunity in HRS § 386–8 is of little assistance in determining the scope of the terms involved. The legislative history provides that:

> The purpose of this bill is to prevent an action for damages by one employee against a fellow employee who may have injured him [or her] in the course of the employment. However, if the injury was caused by wilful or wanton misconduct, the employee's right to sue his [or her] fellow employee is preserved. In any case

the injured employee would have his rights to compensation and medical care under the work[ers'] compensation law.

Hse. Stand. Comm. Rep. No. 631, in 1953 House Journal, at 726.

> The purpose of this bill is to exempt from liability under Act 194, Series A–86, 1951 Session Laws (Third Party Liability Statute under Work[ers'] Compensation Law) employees who may injure a fellow employee while in the course of the employment and with no wilful or wanton misconduct involved. The injured employee, of course, would still have his [or

*ic Int'l Servs. Corp. v. Hurip,* 76 Hawai'i 209, 216, 873 P.2d 88, 95 (1994). Where the language of a statute is plain and unambiguous, our only duty is to give effect to the statute's plain and obvious meaning. *Bumanglag v. Oahu Sugar Co., Ltd.,* 78 Hawai'i 275, 280, 892 P.2d 468, 473 (1995). Further, in interpreting a statute, we give the words their common meaning, unless there is something in the statute requiring a different interpretation. *Ross v. Stouffer Hotel Co. (Hawai'i) Ltd.,* 76 Hawai'i 454, 461, 879 P.2d 1037, 1044 (1994); *see also State v. Aluli,* 78 Hawai'i 317, 320, 893 P.2d 168, 171 (1995).

The term "willful and wanton misconduct" is defined in pertinent part as "[c]onduct which is *either* intentional *or committed under circumstances exhibiting a reckless disregard for the safety of others* [.]" *Black's Law Dictionary* 1600 (6th ed.1990) (emphasis added and citation omitted). "Willful" is defined in pertinent part as "[p]remeditated; malicious; done with evil intent, or with a bad motive or purpose, *or with indifference to the natural consequences;* unlawful; without legal justification." *Id.* at 1599 (emphasis added); *see also Marshall v. University of Hawai'i,* 9 Haw.App. 21, 36 n. 18, 821 P.2d 937, 946 n. 18 (1991) (quoting identical definition). "Wanton" is defined in pertinent part as "*[r]eckless, heedless,* malicious; *characterized by extreme recklessness or foolhardiness; recklessly disregardful of the rights or safety of others or of consequences.*" *Id.* at 1582 (emphases added and citation omitted).

As is evident from the above-quoted definitions, the plain meaning of the term "wilful and wanton misconduct" encompasses both reckless conduct that lacks a specific intent to cause injury and intentional conduct motivated by a specific intent to cause injury.

2. **Co–Employee Suits Based on Reckless Conduct Are Not Inconsistent With the Purposes of Hawai'i's Workers' Compensation Scheme Or the Purposes of Workers' Compensation in General.**

█ As Professor Larson notes, "[t]he necessity for workers' compensation legislation

arose out of the coincidence of a sharp increase in industrial accidents attending the rise of the factory system and a simultaneous decrease in the employee's common law remedies for his [or her] injuries." 1 A. Larson, *The Law of Workmen's Compensation* § 4.00, at 2–1 (1995) [hereinafter Larson]; *see also generally* J. Henderson, Jr. & R. Pearson, *The Torts Process,* ch. 9.A, at 844 (3rd ed. 1988) ("One of the significant impacts of the Industrial Revolution in this country in the latter half of the nineteenth century was the rapid increase in industrial accidents and employee injuries. Unsafe working conditions combined with expansion of the industrial work force to produce a steady stream, and then a flood, of disabling accidents."). The combination of the virtual inevitability of work-related accidents and the austere effects of the fellow-servant rule, which barred recovery from a common master for the negligence of a fellow servant, *see, e.g., Farwell v. Boston & Worcester R.,* 4 Met. (Mass.) 49 (1849), and the doctrines of contributory negligence and assumption of risk, left many injured workers and their dependents without a remedy. Yet to allow suits based on negligence in the workplace would undoubtedly affect the economic livelihood and/or survival of many industries. A compromise was thus struck in the form of a scheme of workers' compensation, wherein the employee "is automatically entitled to certain benefits whenever he [or she] suffers a 'personal injury by accident arising out of and in the course of employment' or an occupational disease" and "negligence and fault are largely immaterial, both in the sense that the employee's contributory negligence does not lessen his [or her] rights and in the sense that the employer's complete freedom from fault does not lessen his [or her] liability[.]" 1 Larson, *supra,* § 1.10 at 1–1 to 1–2.

█ In accord with the foregoing principles, one of the primary purposes underlying the implementation of a workers' compensation scheme in Hawai'i was to eliminate suits based on negligence in the workplace and to spread the costs of work-related inju-

her] rights under the work[ers'] compensation law.

Sen. Stand. Comm. Rep. No. 306, in 1953 Senate Journal, at 480.

ries over the industry. As we noted in *Coates*,

> [T]he purpose of the Work[ers'] Compensation Law is to charge against industry the pecuniary loss arising from disabling or fatal personal injury, regardless of *negligence* by the employee or lack of *negligence* by the employer; that it is designed to obtain for an injured work[er] or his [or her] dependents an assured, certain and prompt compensation to replace the doubtful right accorded by common law, and to secure for the employer freedom from vexatious, delaying and uncertain litigation with its possibilities of heavy penalties by way of verdicts and high costs; that it is based on the obligation of industry to recognize accidental injury and death arising out of employment as one of the costs of production. . . .

71 Haw. at 364, 791 P.2d at 1260–61 (emphasis added) (quoting *Costa Minors v. Flintkote Co.*, 42 Haw. 518, 530 (1958)).

■ Moreover, as Professor Larson notes, the purposes behind employer immunity from negligence actions is analogous to, and furthered by, extension of immunity to co-employee suits based on negligence as well:

> The reason for the employer's immunity is the *quid pro quo* by which the employer gives up his [or her] normal defenses and assumes automatic liability, while the employee gives up his [or her] right to common-law verdicts. This reasoning can be extended to the tortfeasor co[-]employee; he [or she], too, is involved in this compromise of rights. Perhaps, so the argument runs, one of the things he [or she] is entitled to expect in return for what he [or she] has given up [*i.e.*, "normal defenses"] is freedom from common-law suits based on industrial accidents in which he [or she] is at fault.

2A Larson, *supra*, § 72.22, at 14–152. With the foregoing principles and purposes in mind, allowing suits between co-employees based on *reckless* conduct does not impair or contravene the workers' compensation scheme's elimination of suits between co-employees based on employees' *negligence* in the workplace; to the contrary, allowing suits against an employee for torts based on intentional or reckless conduct may deter the employee from future misconduct, thereby contributing to a safer workplace.[5] *See generally* Annotation, *Willful, Wanton, or Reckless Conduct of Co[-]employee as Ground of Liability Despite Bar of Workers' Compensation Law*, 57 A.L.R.4th 888, 891 (1987 and Supp.1994).

■ Moreover, we have often noted, in the context of punitive damages, that reckless conduct is capable of being deterred. *See, e.g., Masaki v. General Motors Corp.*, 71 Haw. 1, 16, 780 P.2d 566, 575 (1989) ("We have repeatedly said that the fundamental purpose underlying an award of exemplary or punitive damages is to punish the wrongdoer and to *deter* him [or her] and others from committing similar wrongs and offenses in the future. . . . [In order to merit an award of punitive damages,] [t]he plaintiff must prove by clear and convincing evidence that the defendant has acted *wantonly or oppressively* or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some *wilful misconduct or that entire want of care* which would raise the presumption of a *conscious indifference to consequences*." (Emphases added and citations omitted.)); *Ross*, 76 Hawai'i at 466, 879 P.2d at 1049 ("In order to recover punitive damages based on a breach of a contract, one must show that the contract was breached in such a *wilful, wanton, or reckless manner* as to result in a tortious injury." (Internal quotation marks, brackets, and citation omitted.) (Emphasis added.)); *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 139 n. 23, 839 P.2d 10, 37 n. 23 (1992) ("Although this court has recognized that punitive damages may be awarded for a breach of contract, we have also limited such a recovery to instances in which the contract is breached in such a

---

5. We emphasize, however, that the holdings and rationale expressed in this case are strictly limited to the context of the "wilful and wanton misconduct" exception to *co-employee* immunity in HRS § 386–8. We express no opinion regarding, nor do we acknowledge the existence of, any analogous exceptions to *employer* immunity.

*wilful, wanton or reckless manner* as to result in a tortious injury." (Citations omitted and emphasis added.)).[6]

The Supreme Court of North Carolina has likewise concluded that:

> Permitting an injured worker to bring an action against a co-employee for an intentional tort places responsibility upon the tortfeasor where it belongs. Since the commission of an intentional tort includes a constructive or actual intent to injure, allowing an injured co-worker to sue the tortfeasor serves as a deterrent against future misconduct. *By allowing wanton negligence to support awards of punitive damages, we have recognized that such conduct can be deterred* and should be treated as an intentional tort. Therefore we hold that the Workers' Compensation Act does not shield a co-employee from liability for injury caused by his [or her] willful, wanton and reckless negligence.

*Pleasant v. Johnson,* 312 N.C. 710, 325 S.E.2d 244, 249 (1985) (emphasis added). We therefore hold that allowing suits between co-employees based upon reckless conduct does not contravene or impair the purposes of Hawai'i's workers' compensation scheme.

**3. Interpretation of Exceptions to Co–Employee Immunity in Other Jurisdictions Is Consistent With an Interpretation of HRS § 386–8 That Allows Co–Employee Suits Based on Reckless Conduct.**

Both parties cite to case law from other jurisdictions in support of their respective interpretations of HRS § 386–8. Of the other jurisdictions that provide co-employees with immunity from common law tort actions in situations covered by workers' compensation acts, thirty-four states have codified a statutory exception to such immunity in cases involving injuries caused by conduct committed with a degree of culpability greater than negligence, worded in various ways. *See, e.g.,* Ariz. Const., art. 18, § 8 (excepting

conduct from co-employee immunity "if the injury is the result of an act done by the employer or a person employed by the employer knowingly and purposely with the direct object of injuring another, and the act indicates a wilful disregard of the life, limb or bodily safety of employees[.]"); Cal. Labor Code § 3601(a) (1971) (excepting "wilful and unprovoked physical act[s] of aggression by another employee"); Conn. Gen.Stat. Ann. § 31–293a (1972) (excepting "wilful or malicious" conduct); Fla. Stat. § 440.11(1) (1988) (excepting acts committed with "willful and wanton disregard" or "unprovoked physical aggression" or with "gross negligence"); Iowa Code Ann. § 85.20 (Spec.Pamp.1975) (excepting acts done with "gross negligence" amounting to "wanton neglect"); Minn.Stat. § 176.061, subd. 5(c) (1986) (excepting injuries resulting from a co-employee's "gross negligence" or injuries "intentionally inflicted by the co-employee."); Mont. Rev.Codes Ann. § 92–204.1 (Cum.Supp.1975) (excepting "intentional and malicious" conduct); Neb. Rev.Stat. § 48–111 (1975) (excepting injuries "proximately caused by … wilful and unprovoked physical aggression"); Or.Rev.Stat. § 656.018(3)(a) (1974) (excepting injuries caused by "willful and unprovoked aggression" of a co-employee); Pa. Stat. Ann., title 77, § 72 (Cum.Supp.1975) (excepting "intentional wrongs"); W. Va.Code. Ann. § 23–2–6a (1973) (excepting injuries caused by a co-employee's "deliberate intention," defined in section 23–4–2(c)(2)(i) as a "consciously, subjectively and deliberately formed intention to produce the specific result of injury or death to an employee"); *see generally* 2A Larson, *supra,* § 72.21, at 14–119 n.23 (1995).

Although, as noted above, several other jurisdictions have similarly worded exceptions to co-employee immunity, Hawai'i's formulation of its exception is unique in that the scope of the conduct to which it applies is defined solely by the terms "wilful and wanton." Case law from other jurisdictions is therefore of limited assistance in interpreting

---

**6.** It is important to note, however, that although tortious conduct meriting the imposition of punitive damages and tortious conduct falling within the exception to co-employee immunity in HRS § 386–8 are measured by similar terms, the standards are not identical. Accordingly, a determination that conduct constitutes "wilful and wanton misconduct" does not necessarily imply that the conduct also merits the imposition of punitive damages.

HRS § 386–8. What is clear from case law in other jurisdictions, however, is that, in states whose statutes specifically except injuries caused by strictly "wilful" or "malicious"—as opposed to "wanton"—conduct from co-employee immunity, the injurious conduct must be motivated by a specific intent to cause injury.

For example, in *Nolan v. Borkowski*, 206 Conn. 495, 538 A.2d 1031 (1988), the plaintiff injured her back while working at her job at a bakery. The plaintiff brought suit pursuant to Connecticut General Statutes § 31–293a, which allowed suits between co-employees for injuries based on "wilful and malicious" wrongs. In her complaint, the plaintiff alleged that the defendants, her supervisors, deliberately disregarded her doctor's restrictions on the range of weight she should lift and the hours she should work. The trial court granted summary judgment in favor of the defendants and against the plaintiff. The Supreme Court of Connecticut affirmed, holding that summary judgment was properly granted because the plaintiff's affidavits, submitted in opposition to the defendants' summary judgment motion, were insufficient to establish that the defendants' actions were "wilful and malicious." In defining the term "wilful and malicious," the court noted:

A wilful and malicious injury is one inflicted intentionally without just cause or excuse. It does not necessarily involve the ill will or malevolence shown in express malice. Nor is it sufficient to constitute such an injury that the act resulting in the injury was intentional in the sense that it was the voluntary action of the person involved. Not only the action producing the injury but the resulting injury must be intentional. A wilful or malicious injury is one caused by design. Wilfulness and malice alike import intent. . . . [Its] characteristic element is the design to injure either actually entertained or to be implied from the conduct and circumstances. The intentional injury aspect may be satisfied if the resultant bodily harm was the direct and natural consequence of the intended act.

*Id.* 538 A.2d at 1033–34 (brackets and omissions in original) (citations omitted).

Similarly, in *Soares v. City of Oakland*, 9 Cal.App.4th 1822, 12 Cal.Rptr.2d 405 (1992), the plaintiff was injured by a co-employee while performing his job as a civilian jailer at the Oakland city jail. As previously noted, California Labor Code § 3601(a)(1) allows for suits between co-employees when the injured employee's injury is "proximately caused by the willful and unprovoked physical act of aggression of the other employee." The action proceeded to a jury trial, and the jury exonerated the defendants. The California Court of Appeal affirmed the trial court's giving of a jury instruction that provided that "[a]n employee may recover damages for an injury against a fellow employee for a willful and unprovoked physical act of aggression. . . . Willful is defined as an intentional and deliberate act done with the specific intent to injure the person." *Id.* 12 Cal. Rptr.2d at 407. The court specifically held that " 'acts of aggression' are only 'willful' for purposes of section 3601(a)(1) if they are intended to injure." *Id.*

Unlike Connecticut or California, however, Hawaiʻi's statutory exception to co-employee immunity is not limited to "wilful" or "malicious" conduct; it includes "wanton" conduct, which we believe bears closer resemblance to statutes in other jurisdictions that provide a more expansive scope to their exception to co-employee immunity. For example, in *Thompson v. Bohlken*, 312 N.W.2d 501 (Iowa 1981), the Supreme Court of Iowa was presented with the opportunity to interpret Iowa Code § 85.20 (1977), which provides that workers' compensation constitutes the exclusive remedy for injuries caused by a co-employee, except where the injury is "caused by the other employee's gross negligence amounting to such lack of care as to amount to *wanton* neglect for the safety of another." *Id.* at 504 (emphasis added). In analyzing the scope of the exception, the *Thompson* court noted:

Similar to wilful or reckless conduct, "wanton" conduct lies somewhere between the mere unreasonable risk of harm in ordinary negligence and intent to harm. [W. Prosser, *Handbook of the Law of Torts*

§ 34] at 184–85 [ (4th ed.1971) ]. The author further explains the concept:

> The usual meaning assigned to "wilful," "wanton" or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to or so obvious that he [or she] must be taken to have been aware of it, and so great as to make it highly *probable* that harm would follow.

*Id.* at 185 (emphasis added). It is said that the concept involves the combination of attitudes: a realization of imminent danger, coupled with a reckless disregard or lack of concern for the *probable* consequences of the act.... Another authority labels both "wanton" and "wilful" misconduct as "reckless disregard for the safety of another,"

*Restatement [ (Second) of Torts,]* § 500, at 587 [ (1965) ], and distinguishes it from intentional misconduct only in that it requires a realization of a strong *probability* of harm to another rather than the substantial *certainty* accompanying an intentional act, *id.,* § 500(f), at 590.

Other authorities distinguish between wilfulness, characterized by intent to injure, and wantonness, which merely implies an indifference to whether the act will injure another. *E.g.,* 57 Am.Jur.2d *Negligence* § 102, at 452–53 (1971). The difference is illustrated by comparing the throwing of an object with intent to strike another and throwing it without such intent, but believing that it will, in fact, strike another, and proceeding with indifference as to whether it does not.... Wantonness is said to be less blameworthy than an intentional wrong only in that instead of affirmatively wishing to injure another, the actor is merely willing to do so.

*Id.* at 504–505 (emphasis in original). Based on the analysis quoted above, the *Thompson* court formulated a three-part test to determine when conduct would rise to the level of "wanton neglect," the elements of which are: "(1) knowledge of the peril to be apprehended; (2) knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) a conscious failure to avoid the peril." *Id.* at 505.

Many cases since *Thompson* have interpreted *Thompson*'s three-part test. *See Larson v. Massey–Ferguson, Inc.,* 328 N.W.2d 343 (Iowa.Ct.App.1982) (evidence that employee's supervisor knew of danger associated with post-hole digger machine's unshielded "power take-off shaft," that he was familiar with the reasons underlying subsequent Occupational Safety and Health Administration regulations requiring guards to shield the shafts, that he knew that his order requiring weight to be placed on post-hole digger arm required worker to work in close proximity to the unshielded shaft, and that injury was probable whenever working near unshielded moving parts sustained finding that supervisor was guilty of wanton neglect and thus could be held liable to injured worker); *Taylor v. Peck,* 382 N.W.2d 123 (Iowa 1986) (holding that there was insufficient evidence of wanton neglect by co-employee toward claimant to impose liability on co-employee, where there had been no previous accidents on particular punch press, no safety inspections to alert employee of danger or malfunction concerning activation of machine, and no evidence that co-employee knew that safety mechanism was partially dismantled, and co-employee did not instruct claimant to put her hand into die to check loose pin); *Justus v. Anderson,* 400 N.W.2d 66 (Iowa.Ct.App.1986) (finding that co-employee who redesigned warehouse should have foreseen that his conduct would probably result in injury to warehouse employee, for purpose of determining that co-employee was grossly negligent so as to permit tort recovery, was not sufficiently supported by evidence that co-employee knew that four-high stack of paper products might fall and seriously injure someone, absent evidence that co-employee knew that, in this situation, injury was probable, as opposed to merely possible); *Woodruff Const. Co. v. Mains,* 406 N.W.2d 787 (Iowa 1987) (evidence that foreman was verbally abusive toward claimant for most of day and, prior to claimant's falling into hole while working on roofing job, foreman ordered claimant to report to him, purportedly causing claimant to walk into the hole, deemed insufficient to establish that

foreman knew injury to claimant was probable, as opposed to merely possible result of his order); *Eister v. Hahn*, 420 N.W.2d 443 (Iowa 1988) (In face of evidence that claimant moved into danger zone of "corn head" apparatus of combine machine without being requested to do so by combine operator, as well as lack of evidence that operator had knowledge that injury was probable, as opposed to merely possible, finding that operator did not engage in wanton neglect was sufficiently supported by evidence; operator's violation of occupational safety regulation, in failing to turn off combine engine prior to having claimant clean "corn head" not sufficient to show wanton neglect); *Henrich v. Lorenz*, 448 N.W.2d 327 (Iowa 1989) (for purposes of coming within exception to co-employee immunity provision of workers' compensation law, employee failed to prove wanton neglect on part of plant supervisory and management personnel in connection with prevailing working conditions and work practices involved in use of "butt skinner" machine at meat packing plant, where plant had experienced only four skinner-related hand cuts in one year preceding employee's accident, none of injuries were serious, and many of the supervisory and management personnel involved had themselves operated butt skinner under same conditions and with same instructions given employee; defendant's knowledge of actuarial foreseeability, even certainty, that accidents will happen, did not satisfy requirement under wanton neglect exception to co-employee liability that co-employees have knowledge that injury was probable, as opposed to possible, result of danger); *Swanson v. McGraw*, 447 N.W.2d 541 (Iowa 1989) (whether sanitation worker's supervisor and night plant manager engaged in wanton neglect in allowing worker-claimant to apply caustic soap when the supervisor and manager knew the protective rain suit worn by the worker had a hole in it, and several employees had been burned while applying the soap in the past, was question for the jury; interpreting *Thompson* standard as "difficult to prove"); *Gerace v. 3–D Mfg. Co., Inc.*, 522 N.W.2d 312 (Iowa.Ct.App. 1994) (president and fabrication manager of hose and belting company did not have knowledge that injury was probable, rather than merely possible, result of purchase and use of belt mover and, thus, "wanton neglect" exception to co-employee immunity did not apply so as to render president and manager liable to company employee who slipped and fell while operating handle in front of moving belt mover, where transporting belts from storage into plant had been done repeatedly with belt mover without incident, and there was no evidence that defendants knew of any danger along mover route).

■ We agree with the Iowa courts' analyses and adopt the three-part test first enunciated in *Thompson* in aid of our interpretation of HRS § 386–8. Therefore, the term "wilful and wanton misconduct," as used in HRS § 386–8, includes conduct that is either: (1) motivated by an actual intent to cause injury; or (2) committed in circumstances indicating that the injuring employee (a) has knowledge of the peril to be apprehended, (b) has knowledge that the injury is a probable, as opposed to a possible, result of the danger, and (c) consciously fails to avoid the peril.

### C. Claims Based on "Wilful and Wanton Misconduct" Must be Proven by Clear and Convincing Evidence

■ Although we hold today that the "wilful and wanton misconduct" exception to co-employee immunity set out in HRS § 386–8 includes suits based on reckless conduct, we are also cognizant of two additional concerns, alleviation of which would be accomplished with a single solution: the imposition of the clear and convincing standard of proof on claims of wilful and wanton misconduct. We address each concern in turn.

First, as previously discussed, a central feature of Hawai'i's workers' compensation system is the elimination of suits based on negligence in the workplace.[7] In light of our holding that reckless conduct—which otherwise satisfies the three-part *Thompson* test—can constitute "wilful and wanton misconduct" within the meaning of HRS § 386–8, we are aware of the risk that, in the future, a factfinder could erroneously con-

---

7. *See supra* section III.B.2.

strue conduct that is in fact merely negligent as being "wilful and wanton."

Relative to this concern, the clear and convincing standard of proof would endow a factfinder's determination that a suit is based on wilful and wanton misconduct with a greater degree of certainty. In *Masaki v. General Motors Corp.*, 71 Haw. 1, 780 P.2d 566 (1989), we held that the clear and convincing standard of proof applied to a claim for punitive damages. In so holding, we noted that "[t]he purpose of fixing a particular standard of proof is to instruct the factfinder concerning the degree of confidence our society thinks he [or she] should have in the correctness of factual conclusions for a particular type of adjudication[,]" *id.* at 13, 780 P.2d at 574 (citation omitted), and that the clear and convincing evidence standard has been recognized as "a more exacting standard [that] has been applied to a wide variety of civil cases where for policy reasons the courts require a higher than ordinary degree of certitude before making factual findings." *Id.*

 Similarly, application of the clear and convincing standard of proof to tort actions against defendant co-employees would impose "a higher than ordinary degree of certitude" upon the factfinding function, thus according greater protection to the defendant co-employee and furthering the objective of the co-employee immunity provisions of HRS § 386–8. As we noted in *Masaki*:

> The choice of standard of proof also "serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323, 329 (1979).
>
> The law has evolved three standards of levels of proof for different types of cases. In most civil proceedings, such as a case involving a monetary dispute between private parties, the plaintiff must show by a "preponderance of the evidence" that his or her claim is valid. Under the preponderance standard, the parties share the risks of an erroneous verdict in roughly equal fashion. *Id.* at 423, 99 S.Ct. at 1808, 60 L.Ed.2d at 329. The preponderance

standard directs the factfinder to decide whether "the existence of the contested fact is more probable than its nonexistence." E. Cleary, *McCormick on Evidence* § 339, at 957 (3d ed.1984). As one commentator points out, to prevail, "[a] plaintiff need only offer evidence sufficient to tip the scale slightly in his or her favor, and a defendant can succeed by merely keeping the scale evenly balanced." Comment, *The Imposition of Punitive Damages in Product Liability Actions in Pennsylvania*, 57 Temp. L.Q. 203, 224 (1984).

> At the other end of the spectrum, in criminal proceedings, the government is required to prove its case "beyond a reasonable doubt." Society has judged that it is significantly worse for an innocent [person] to be found guilty of a crime than for a guilty [person] to go free. Therefore, as stated by the Supreme Court, "[w]here one party has at stake an interest of transcending value—as a criminal defendant his [or her] liberty—this margin of error is reduced as to him by the process of placing on the other party the burden ... of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt." *Speiser v. Randall*, 357 U.S. 513, 525–26[,] 78 S.Ct. 1332, 1341[,] 2 L.Ed.2d 1460, 1472 (1958); *see also Addington*, 441 U.S. at 423–24, 99 S.Ct. at 1808, 60 L.Ed.2d at 329.

> The level of proof between these two extremes is that of "clear and convincing" evidence....

> . . . .

> Thus, "clear and convincing" evidence may be defined as an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases. It is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable. *See Welton v. Gallagher*, 2 Haw.App. 242, 245–46, 630 P.2d 1077, 1081 (1981); *Bud Wolf Chevrolet, Inc. v. Robert-*

**14**

*son,* 519 N.E.2d 135, 138 (Ind.1988); McCormick, *supra,* § 340 at 959–60.

*Id.* at 14–15, 780 P.2d at 574–75.

Second, we are also aware that, as in cases involving allegations of fraud, quasi-criminal wrongdoing, and the imposition of punitive damages, a suit based on a co-employee's "wilful and wanton misconduct" may have a stigmatizing effect on a co-employee defendant's reputation. The clear and convincing standard would ameliorate this risk. As we have previously noted, the clear and convincing standard

is typically used in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of have his [or her] reputation tarnished erroneously by increasing the plaintiff's burden of proof.

*Id.* at 15, 780 P.2d at 574 (citation and internal quotation marks omitted). Similarly,

Clear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals to prove willful, wrongful and unlawful acts to justify an exceptional judicial remedy.

So, in a number of cases where an adverse presumption is to be overcome, or on grounds of public policy and in view of peculiar facilities for perpetrating injustice by fraud or perjury, the degree of proof required is expressed in such terms as "clear and convincing" ʻand the phrase "preponderance of the evidence" has been expressly disapproved as an insufficient measure of the proof required.

*Id.* at 15–16, 780 P.2d at 575 (quoting *Travelers Indem. Co. v. Armstrong,* 442 N.E.2d 349, 360 (Ind.1982) (brackets and ellipsis points omitted)). In keeping with these principles, Hawaiʻi's appellate courts have implemented the clear and convincing standard of proof in a myriad of situations. *See, e.g.,*

*Carr v. Strode,* 79 Hawaiʻi 475, 904 P.2d 489 (1995) (proof to overcome presumption of paternity); *State v. Miller,* 79 Hawaiʻi 194, 900 P.2d 770 (1995) (proof to establish that criminal defendant is not a flight risk or danger to the community); *State v. Lopez,* 78 Hawaiʻi 433, 896 P.2d 889 (1995) (inevitable discovery rule); *Cresencia v. Kim,* 10 Haw. App. 461, 878 P.2d 725 (1994) (fraud); *Calleon v. Miyagi,* 76 Hawaiʻi 310, 876 P.2d 1278 (1994) (punitive damages); *Maria v. Freitas,* 73 Haw. 266, 832 P.2d 259 (1992) (constructive trust); *Office of Disciplinary Counsel v. Rapp,* 70 Haw. 539, 777 P.2d 710 (1989) (professional misconduct); *Chan v. Chan,* 7 Haw.App. 122, 748 P.2d 807 (1987) (civil contempt); *Mehau v. Gannett Pacific Corp.,* 66 Haw. 133, 658 P.2d 312 (1983) (defamation); *Woodruff v. Keale,* 64 Haw. 85, 637 P.2d 760 (1981) (termination of parental rights); *Tanuvasa v. City and County of Honolulu,* 2 Haw.App. 102, 626 P.2d 1175 (1981) (proof that government official acted with malice); *Boteilho v. Boteilho,* 58 Haw. 40, 564, P.2d 144 (1977) (oral contract for sale of real estate).

Accordingly, for the foregoing reasons, we hold that claims based on wilful and wanton misconduct must be proven by clear and convincing evidence.

D. *The Dissent Advocates a Position That Unnecessarily Departs From the Plain Meaning of the Workers' Compensation Statute and Effectively Contravenes Statutory Rights Granted by the Workers' Compensation Scheme Set Out by HRS Chapter 386*

The dissent takes issue with virtually all of the foregoing reasoning, encouraging instead the adoption of a position that effectively grants Dr. Mee–Lee—and ostensibly all supervisory employees—immunity co-extensive with that accorded the employer under HRS § 386–5 by virtue of the supervisory nature of their positions. The position advocated by the dissent is imprudent for five principal reasons, which we discuss in turn as follows.

### 1. Plain Meaning.

First, the position urged by the dissent is contrary to the ·plain meaning of the lan-

guage used by the legislature in the workers' compensation statute. Under the dissent's position, Dr. Mee–Lee, as a "supervisory" employee, would be entitled to immunity under HRS § 386–5 and would therefore be immune from Iddings's action against him. The dissent's position, however, is in conflict with the plain meaning of the language of HRS § 386–5 because the immunity accorded by HRS § 386–5 extends only to "employers." HRS § 386–5 provides in pertinent part that "[t]he rights and remedies herein granted to an employee ... on account of a work injury suffered by the employee shall exclude all other liability of the *employer* to the employee" (emphasis added). "Employer" is defined in HRS § 386–1 (1993) as "any person having one or more persons in the person's *employment.*" (Emphasis added.) "Employment" is defined in HRS § 386–1 as "any service performed by an individual for another person *under any contract of hire or apprenticeship,* express or implied, oral or written, whether lawfully or unlawfully entered into." (Emphasis added.) Therefore, under the definitional scheme set out in HRS § 386–1, in order to qualify as an employer, a person must be the recipient of services pursuant to a "contract of hire or apprenticeship." In the present case, the parties do not dispute, and it is clear from the record, that any "contract of hire or apprenticeship" pertaining to Iddings's "employment" runs between Iddings and CMC, and not between Iddings and Dr. Mee–Lee. Pursuant to the plain meaning of the definitions set out in HRS § 386–1, therefore, Dr. Mee–Lee does not qualify as an "employer" entitled to immunity under HRS § 386–5.

Additionally, the plain language of HRS § 386–8, describing the right to sue co-employees for injurious wilful and wanton misconduct, is without limitation; HRS § 386–8 provides in pertinent part that *"[a]nother employee of the same employer* shall not be relieved of his [or her] liability as a third party, if the personal injury is caused by his [or her] wilful and wanton misconduct." A plain reading of the language used provides no indication that the legislature's use of the terms "another employee of the same employer" sought to limit suits based on wilful and wanton misconduct solely to non-supervisory co-employees. To the contrary, the broad scope of the terms used instead implies a legislative intent to include all other employees of the same employer within the scope of exposure to suit without limitation.

### 2. Departure From the Plain Meaning of the Statute Is Unwarranted and Unnecessary.

 Second, it is well settled that this court may depart from a plain reading of a statute where a literal interpretation would lead to absurd and/or unjust results. *See, e.g., Sato v. Tawata,* 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995) (court may examine sources other than language of statute itself to determine if literal construction would produce absurd or unjust result inconsistent with the policies of the statute); *Dines v. Pacific Ins. Co., Ltd.,* 78 Hawai'i 325, 337, 893 P.2d 176, 188 (1995) (Ramil, J., dissenting) ("Statutory construction dictates that an interpreting court should not fashion a construction of statutory text that effectively renders the statute a nullity or creates an absurd or unjust result."). Presumably in keeping with this principle of statutory construction, the dissent contends that "it would be absurd to have the employer provide benefits to the injured employee through workers' compensation, and, at the same time, indemnity coverage to the supervisory employee." Dissenting opinion at —— n. 11, 919 P.2d at 290 n. 11.

 The infirmity in the dissent's position is that indemnity agreements in the workers' compensation context are not only not absurd, but, pursuant to our holdings in previous cases, entirely permissible. First, it is well-established in our precedent that "the exclusive liability provision [of HRS § 386–5] precludes only those actions which arise 'on account' of the employee's injury[,]" and that "[a] third party claim for indemnity is not based on the employee's injury but is for reimbursement *based upon contract or some other independent duty existing between indemnitor and indemnitee." Kamali v. Hawaiian Elec. Co., Inc.,* 54 Haw. 153, 159, 504 P.2d 861, 865 (1972) (emphasis added); *see also Keawe v. Hawaiian Elec. Co., Inc.,* 65 Haw. 232, 236–37, 649 P.2d 1149, 1153 (1982);

*Espaniola v. Cawdrey Mars Joint Venture,* 68 Haw. 171, 176–77, 707 P.2d 365, 369–70 (1985). As the ICA made clear in its opinion in *Messier v. Association of Apartment Owners of Mt. Terrace,* 6 Haw.App. 525, 735 P.2d 939 (1987), absent an "independent duty" or a contract for indemnity between, in this case, the indemnitor-employer and the indemnitee-supervisory employee, a valid claim for indemnity shall not lie. In *Messier,* the plaintiff (Messier), a resident of the Mt. Terrace condominium and general manager of the association of apartment owners (AOAO), was injured when he was struck by a metal panel while he was allegedly working on the roof of the condominium during a rainstorm. Messier applied for, and received, workers' compensation benefits from his employer, the AOAO, and brought suit against Kaiser–Aetna (Kaiser), who designed and constructed the building, and the AOAO. Kaiser brought a cross-claim for indemnity against Dillingham Corporation (Dillingham), Kaiser's general contractor for the project. Kaiser and Dillingham both cross-claimed for indemnity against the AOAO; however, Kaiser and Dillingham did not have a contractual basis for indemnity with the AOAO. Messier's suit against the AOAO was barred by HRS § 386–5, and Kaiser's and Dillingham's cross-claims for indemnity were dismissed.

On appeal, the ICA affirmed the trial court's dismissal of Kaiser's and Dillingham's cross-claims, holding that:

> Kaiser and Dillingham contend that Association's indemnity obligation is based upon Association's breach of an independent duty owed to them. Dillingham states that Association's duty "was to properly maintain and repair the Mt. Terrace condominium building and to adequately warn its employees of a known, potentially dangerous condition." However, the duty argued for by Dillingham is not owed to Kaiser and Dillingham, and cannot be relied upon by them.
>
> The question of duty is a question of law to be determined by reference to the body of statutes, rules, principles, and precedents which make up the law. We have not been made aware of any independent duty owned by Association to either Kaiser or Dillingham, or both, which would give rise to Association's liability to them as an indemnitor.
>
> It follows that the cross-claims of implied indemnity made by Kaiser and Dillingham against the Association are[, tracking the language of HRS § 386–5,] "on account of" Messier's injuries, and were properly disposed of.
>
> . . . .
>
> As a matter of law Kaiser and Dillingham are not entitled to indemnity from Association and judgment was properly entered against them.

*Id.* at 539, 735 P.2d at 949 (citations omitted). Therefore, applied to the present case, absent a contractual indemnification agreement between CMC, as indemnitor, and Dr. Mee–Lee, as indemnitee, or another independent duty distinct from the duty to provide Iddings with a safe place to work, Dr. Mee–Lee will not be able to secure indemnity from CMC for a judgment against him in a suit by Iddings, should Iddings prevail. The dissent's concerns over a lengthy, wasteful cycle of money changing hands, therefore, are unfounded.

 Moreover, it is further well settled that contractual indemnification agreements and "hold harmless" clauses are valid in the workers' compensation context and do not contravene or undermine the purposes underlying workers' compensation in general. For example, in *Keawe,* we noted that:

> In *Kamali,* we determined, on appeal, that while this provision precluded actions for contribution by a third party tortfeasor against an employer, it did not prohibit actions against an employer based on indemnity. We reasoned that, unlike an action based on contribution, an action for indemnification did not arise "on account" of the employee's injury.... However, we cautioned, that although a third party is entitled to sue an employer covered by Hawaii's Worker's Compensation law for indemnity based on a breach of some independent duty, "contracts of indemnity are [to be] strictly construed, particularly where the indemnitee claims that it should be held safe from its own negligence."

65 Haw. at 236, 649 P.2d at 1153 (citations and quotation marks omitted). Thus the dissent's contention that an indemnity agreement "would be another layer of insurance coverage for supervisory employees on top of workers' compensation paid for by employers and, ultimately, the consuming public[,]" Dissenting opinion at ——— n. 11, 919 P.2d at 290 n. 11, is unrelated to our definition of the scope of "wilful and wanton misconduct" today. On the one hand, it is clear that Hawai'i's workers' compensation scheme does not require indemnity agreements, and, on the other hand, as *Kamali, Messier,* and *Keawe* make clear, indemnity agreements do not contravene Hawai'i's workers' compensation scheme. It is therefore entirely permissible under the workers' compensation scheme for an employer and a supervisory employee to *voluntarily* enter into a contractual indemnity agreement for "another layer of insurance coverage." In other words, if "another layer of insurance coverage" exists for supervisory employees, it is because the employer and the supervisory employee agreed to place it there. The workers' compensation statutes do not require them to place it there, nor do the workers' compensation statutes require them to remove it.

The dissent further contends that "[a] typical situation where this absurd result would occur is the following: (1) the injured employee would seek workers' compensation, in addition to damages from the supervisory employee; (2) the supervisor would thereby seek indemnity from the employer; and finally, (3) the employer would then seek reimbursement from the injured employee." Dissenting opinion at 28 n. 11, 919 P.2d at 290 n. 11. We fail, however, to see the absurdity stemming from these three propositions. Proposition (1) merely constitutes the employee exercising his or her rights under the workers' compensation scheme and the express right to sue due to wilful and wanton misconduct under HRS § 386–8. Proposition (2), as explained above, will only come to fruition in the presence of a contractual indemnification agreement or an independent duty between employer and supervisory employee, principles long established in our jurisprudence. Finally, proposition (3) simply reiterates the employer's right of reimburse-

ment for workers' compensation benefits paid out by the employer mandated by HRS § 386–8, which provides in pertinent part that:

> If the [third party] action is prosecuted by the employee alone ... *there shall be applied out of the amount of the judgment or settlement proceeds, the amount of the employer's expenditure for compensation, less his [or her] share of ... expenses and attorney's fee.* On application of the employer, the court shall allow as a first lien against the amount of the judgment for damages or settlement proceeds, the amount of the employer's expenditure for compensation, less his share of such expenses and attorney's fee.

> If the action is prosecuted both by the employee and the employer ... [a]fter the payment of ... expenses and attorneys' fees *there shall be applied out of the amount of the judgment for damages, or settlement proceeds an amount sufficient to reimburse the employer for the amount of his expenditure for compensation* and any excess shall be paid to the injured employee or other person entitled thereto.

(Emphasis added); *cf. Shimabuku v. Montgomery Elevator Co.,* 79 Hawai'i 352, 361, 903 P.2d 48, 57 (1995) (holding, *inter alia,* that, pursuant to HRS § 386–8, employer entitled to reimbursement from portion of employee's settlement with third-party tortfeasor "properly allocable" to employee's tort claim).

### 3. All of the Case Authority Cited by the Dissent in Section VII is Distinguishable.

Third, all of the authority from other jurisdictions cited by the dissent in support of its positions in section VII, *see* dissenting opinion at 27–30, 919 P.2d at 289–292, is readily distinguishable from both the present context and Hawai'i's workers' compensation scheme because all of the decisions are based on statutory workers' compensation schemes that do not incorporate co-employee immunity in actions based on negligence. *See, e.g., Simmons First Nat'l Bank v. Thompson,* 285 Ark. 275, 686 S.W.2d 415, 416–17 (1985) ("Under [Ark. Stat. Ann. § 81–1304 (Supp. 1983) ], a *negligent* coemployee is regarded

as a third person." (Emphasis added.)); *State ex rel. Badami v. Gaertner*, 630 S.W.2d 175, 177 (Mo.Ct.App.1982) ("It is accepted in this state that a co-employee, or fellow servant or foreman is a 'third person' within the meaning of Sec. 287.150 and that he [or she] may be sued by an injured co-employee for his [or her] *negligence* resulting in the compensable injury." (Citations omitted; emphasis added.)); *Kerrigan v. Errett*, 256 N.W.2d 394, 396 (Iowa 1977) ("It should be noted parenthetically that by statutory amendment enacted subsequent to both the ... events of this case the legislature has provided a limited liability *immunity for a co-employee*"; predates the *Thompson* case relied upon above for the rule adopted in the present case); *Athas v. Hill*, 54 Md.App. 293, 458 A.2d 859, 864–65 (1983) ("The immunity granted the employer under our [workers' compensation] Act does not unqualifiedly extend to an employee whose *negligence* caused the injury. The Act 'excludes an action in tort by an employee against his employer, but does not exclude tort actions between co-employees.'" (Citations omitted and emphasis added.)); *Greco v. Farago*, 477 A.2d 98, 98 n. 1 (R.I.1984) ("General Laws 1956 (1979) Reenactment) § 28–29–20 was amended by P.L.1982, ch. 32, art. I, § 1. The statute now provides that compensation under the Workers' Compensation Act 'shall be in lieu of all rights and remedies as to such injury now existing, either at common law or otherwise against an employer, or its directors, officers, agents or employees * * *.' This act statutorily abolishes the claim plaintiff asserts here. However, the record indicates that Greco's injuries occurred in March 1982, whereas the amended version of § 28–29–20 did not become effective until May 6, 1982."; *Laffin v. Chemical Supply Co.*, 77 Wis.2d 353, 253 N.W.2d 51, 53 (1977) ("[S]ec. 102.29 provides that a workers' compensation claim shall ˙not affect the right to maintain an action in tort against a third party. Employees are within the class of 'third parties' within the meaning of the act." (Citations, quotation marks, and brackets omitted.)); *Parker v. St. Louis County Water Co.*, 668 S.W.2d 182 (Mo.Ct.App.1984) (relying on *State ex rel. Badami*, 630 S.W.2d 175). Absent co-employee immunity against suits based on negligence, co-employees are on equal status with all other third parties, regardless of their degree of culpability, and, understandably, the pragmatic economic efficiency of such a workers' compensation scheme absent stringent judicial interpretation is suspect. Under Hawaiʻi's statutory scheme, however, which does incorporate co-employee immunity for suits based on negligence, resort to such judicial legislation is unnecessary.

Similarly, the decision in *Raulerson v. Roehr*, 511 So.2d 1027 (Fla.Dist.Ct.App.1987), reaches an analogous result, albeit by different means. As noted by the dissent, the *Raulerson* court affirmed the trial court's grant of directed verdicts in favor of the defendant supervisory employees because the record lacked any indication that the supervisor committed "any affirmative act of negligence which went beyond the scope of his employer's duty to provide a safe place to work." *Id.* at 1030. The *Raulerson* court held that the duty allegedly breached was the nondelegable duty of the employer to provide a safe place to work, and, therefore, because the duty ran between the supervisory employee to the employer, the injured putative co-employee could not sue the supervisory employee for breach of that duty. The *Raulerson* court, however, did not bar suits against supervisory co-employees under all circumstances. Relying on an earlier decision in *West v. Jessop*, 339 So.2d 1136 (Fla. Dist.Ct.App.1976), the court acknowledged that, where "something extra" over and beyond the duty owed the employer is present, the supervisory employee would be subject to suit.

In sum, in a fashion similar to the other cases relied upon by the dissent, the *Raulerson* decision judicially effects a scheme similar to that already achieved by the Hawaiʻi legislature in HRS chapter 386: a supervisory employee is immune from suits based on the negligent breach of a duty in the course of his or her employment absent "something extra"—that is, wilful and wanton misconduct.

Thus, as the previous discussion indicates, analogous resulting schemes may be achieved in a variety of means: a jurisdiction may

choose not to legislatively incorporate co-employee immunity in its statutory workers' compensation scheme, and yet, very likely out of pragmatic economic concerns, judicially limit the scope of co-employee liability through a focus on a putative tortfeasor employee's status or responsibility, as in *Simmons, State ex rel. Badami, Kerrigan, Athas, Greco, Laffin,* and *Parker,* or concepts of "nondelegable duty," as in *Raulerson;* or a jurisdiction may first statutorily incorporate limited co-employee immunity and judicially interpret the exceptions to that immunity, as in Hawai'i.

The controlling principle, therefore, is judicial deference to the will of the legislature. The language and scheme of HRS chapter 386 reflects the Hawai'i legislature's choices regarding Hawai'i's workers' compensation system, and it is our duty to respect those choices when we interpret the statute. *See, e.g., Allstate Ins. Co. v. Hirose,* 77 Hawai'i 362, 364, 884 P.2d 1138, 1140 (1994) ("Our duty in interpreting statutes is to give effect to the legislature's intent which is obtained primarily from the language of the statute."). Pursuant to HRS § 386–8, *all* co-employees acting within the course of their employment, regardless of position, status, or responsibility, are immune from suits based on their negligence to the very same extent as the employer would be in the same position; the *same* group of employees, however, is subject to a single limitation, in that they remain subject to suits based on wilful and wanton misconduct. In other words, the group of employees subject to the statutory "wilful and wanton misconduct" exception to co-employee immunity is the same group that is accorded statutory co-employee immunity. Even the dissent would undoubtedly agree that co-employee immunity extends to all employees. Under the statute, however, wherever co-employee immunity extends, so does its exception. This scheme reflects the legislature's choice to focus on culpability, rather than status, position, or responsibility as the determining factor in limiting co-employee immunity. To import judicially-created limiting devices from other jurisdictions with dissimilar statutory schemes may unfairly and unnecessarily disturb the delicate balance of rights as set out by the express terms of the workers' compensation statute.

### 4. Suits Based on Reckless Conduct Do Not "Easily Circumvent" the Immunity Provisions of HRS Chapter 386.

Fourth, the dissent's contention that the immunity provisions of HRS chapter 386 may be "easily circumvented by simply claiming that a supervising employee allowed an employee to work in an unsafe environment," dissenting opinion at 19, 919 P.2d at 281, is specious, and the dissent's fear that "almost any claim for an on-the-job injury may be framed as a claim under HRS § 386–8 against a supervising employee for 'wantonly' allowing the employee to work in an unsafe environment," *id.,* is based on an incomplete statement of the standard adopted by this opinion for "wilful and wanton misconduct."

 As previously noted, the standard adopted requires evidence that the tortfeasor co-employee's conduct was either: (1) motivated by an actual intent to cause injury; or (2) committed in circumstances indicating that the injuring employee (a) has knowledge of the peril to be apprehended, (b) has knowledge that the injury is a probable, as opposed to a possible, result of the danger, and (c) consciously fails to avoid the peril. As noted by the Iowa Supreme Court's decision in *Swanson v. McGraw,* 447 N.W.2d 541, 543 (Iowa 1989), the above-delineated standard for wanton conduct is "difficult to prove."

In order to plead and prove a case based on wilful and wanton misconduct, therefore, allegations and proof are required for either an actual intent to injure on the part of the tortfeasor co-employee, or *all three* of the elements of "wanton" conduct, including a conscious failure to avoid the peril. The dissent's concerns over the proliferation of suits is therefore diminished when placed in its proper perspective: it remains the plaintiff's burden to prove all the elements of a suit based on wilful and wanton misconduct.

### 5. Public Policy and Social Costs.

Finally, the net effect of adoption of the dissent's position may lead to disturbing re-

sults. Under the dissent's position, a supervisory employee ostensibly would be absolutely immune from any suit, either because of his or her "supervisory" status or responsibilities or because the employee was carrying out a "nondelegable duty" to his or her employer. Therefore, no matter how intentional, wilful, malicious, culpable, or wanton, the employee's breach of the duty to provide a safe place to work might be, he or she would be absolutely immune from co-employee suits.

Consider an extreme, yet simple example: the supervisor on a renovation project, whose responsibility it is to discharge the employer's duty to provide a safe place to work, orders the excavation of a large portion of the floor immediately outside a co-employee's office door on the second floor of a building, leaving a gaping hole to the floor below. Carrying out her duty to provide a safe place to work, the supervisor orders the hole covered with paper-thin balsa wood. The unfortunate employee, whose office immediately abuts the hole, strolls out, falls through the hole, and is severely injured. Under the dissent's position, because the supervisor is either a "supervisory employee" or is discharging the employer's nondelegable duty to provide a safe place to work, the supervisor would be absolutely immune from co-employee suits, even if she had covered twenty holes with balsa wood in the past, through which twenty people had fallen and were injured.

E. *Genuine Issues of Material Fact Exist Regarding Whether Dr. Mee–Lee Engaged in "Wilful and Wanton Misconduct."*

In the present case, Iddings asserts that, because Dr. Mee–Lee was aware of the risk of injury stemming from crowded patient and furniture conditions in the CMC's Intensive Care Module and yet failed to reduce the patient population, and, thus, the amount of furniture necessary to accommodate the patients, Dr. Mee–Lee engaged in "wilful and wanton misconduct." Iddings's affidavit, submitted in support of her memorandum in opposition to Dr. Mee–Lee's motion for summary judgment, avers in pertinent part:

5. For more than one year prior to my accident, the nursing management personnel in the Human Services Unit had been extremely concerned with the overcrowded conditions within the unit in general and within the Intensive Care Module in particular.

6. As early as August 15, 1990, Defendant Mee–Lee was advised that an unsafe physical environment existed within the Human Services Unit as a result of overcrowding.

7. Patients within the Intensive Care Module frequently are violent. Overcrowding increases the likelihood of violent responses among the patients. In addition, overcrowding results in a dangerous physical environment because it is necessary to introduce extra furniture into the unit to accommodate the additional patients.

8. Beginning in August of 1990, and continuing thereafter, I attended many meetings in which different members of our staff told Defendant Mee–Lee that overcrowding in the Human Service Unit presented a dangerous condition to staff working in the unit.

9. I am aware of approximately ten (10) individuals who were injured within the Human Services Unit between May of 1991 and the date of my accident. I am sure that Defendant Mee–Lee was aware of these incidents because they were discussed at meetings where we both were present.

. . . .

12. Defendant Mee–Lee exercised control over the patient census when it was necessary for his purposes. When Castle Medical Center was inspected by the Joint Committee on Accreditation of Hospitals ("JCAHO"), the census in the Human Services Unit was reduced to less than the licensed capacity. Staff was instructed to remove the third bed from each patient room before their visit. After the visit, the census again increased to more than the authorized capacity.

Based on the allegations made in Iddings's affidavit, we believe that, in view of the interpretation of HRS § 386–8 that we announce today, there are genuine issues of material fact regarding whether Dr. Mee–Lee engaged in "wilful and wanton misconduct," thereby excepting his conduct from the immunity accorded him against suits by co-employees under HRS § 386–8. Specifically, we believe that there are genuine issues of material fact regarding whether Dr. Mee–Lee's alleged failure to reduce the patient population, and, accordingly, the furniture in the CMC's Intensive Care Module that allegedly caused Iddings's injuries, occurred in circumstances indicating that Dr. Mee–Lee: (1) had knowledge of the risk of injury to CMC staff stemming from the alleged overcrowding; (2) had knowledge that injury was a probable, as opposed to a possible, result of the danger; and (3) consciously failed to avoid the peril. Consequently, we hold that the circuit court erred in granting summary judgment in favor of Dr. Mee–Lee and against Iddings.

### IV. CONCLUSION

Based on the foregoing discussion, we vacate the circuit court's order granting summary judgment in favor of Dr. Mee–Lee and against Iddings, and this cause is remanded for further proceedings consistent with this opinion.

RAMIL, Justice, dissenting.

During fiscal year 1994, 43,921 workers' compensation claims were processed in Hawai'i, according to the State of Hawai'i Department of Labor and Industrial Relations' annual report. Because of this court's decision today, similar to the Wyoming experience, we can expect an "abundance of co-employee litigation." *See* Stephanie Materi, *Worker's Compensation—The Dilemma of Co–Employee Immunity and the Confusion in the Aftermath of Mills II. Mills v. Reynolds, 837 P.2d 48 (Wyo.1992),* 28 Land & Water L.Rev. 271 (1993). Indeed, this "excessive furniture" in the workplace case, in my view, signals the erosion of our workers' compensation's exclusive remedy provision. Because I disagree with the majority's prem-

ises that: (1) the plain meaning of the words used in the term "wilful and wanton misconduct" includes reckless conduct; (2) the concept of deterrence is consistent with the workers' compensation scheme; and (3) suits between co-employees based on reckless conduct does not contravene or undermine the purpose of co-employee immunity and the purposes underlying workers' compensation in general, I must disagree with its conclusion that "wilful and wanton misconduct" is an exception to full co-employee immunity. I respectfully dissent.

### I. The Purpose of Hawai'i's Workers' Compensation System is to Eliminate Costly Court Involvement

We explained in *Coates v. Pacific Engineering,* 71 Haw. 358, 364, 791 P.2d 1257, 1260–61 (1990) (quoting *Costa Minors v. Flintkote Co.,* 42 Haw. 518, 530 (1958)), that:

the purpose of the Work[ers'] Compensation Law is to charge against industry the pecuniary loss arising from disabling or fatal personal injury, regardless of *negligence* by the employee or lack of *negligence* by the employer; that it is designed to obtain for an injured work[er] or his [or her] dependents an assured, certain and prompt compensation to replace the doubtful right accorded by common law, and to secure for the employer freedom from vexatious, delaying and uncertain litigation with its possibilities of heavy penalties by way of verdicts and high costs; that it is based on the obligation of industry to recognize accidental injury and death arising out of employment as one of the costs of production.

(Emphasis and brackets added).

Moreover, in *Kepa v. Hawai'i Welding Co., Ltd.,* 56 Haw. 544, 545 P.2d 687 (1976), we described the purpose of Hawai'i's workers' compensation laws as follows:

Work[ers'] compensation laws were enacted as a humanitarian measure, to create legal liability without relation to fault. (Citation omitted.) They represent a socially enforced bargain: the employee giving up his right to recover common law damages (in tort) from the employer in exchange for

the certainty of a statutory award for all work-connected injuries.

*Id.* at 549, 545 P.2d at 691 (brackets added). *See also Lantz v. Nat'l Semiconductor Corp.,* 775 P.2d 937 (Utah App.1989); *Bryan v. Utah Int'l,* 533 P.2d 892, 893–94 (Utah 1975).

To further ensure the separateness of a workers' compensation claim from costly court involvement, workers' compensation laws provide a "presumption" "[t]hat the claim is for a covered work injury." *See* HRS § 386–85 (1993).

Most significant, we said:

> The exclusiveness of remedy is the "keystone" of our Workers' Compensation plan and "anything that tends to erode the exclusiveness of either the liability or the recovery strikes at the very foundation of statutory schemes of this kind, now universally accepted and acknowledged."

*Coates,* 71 Haw. at 365, 791 P.2d at 1261 (citing *Costa Minors,* 42 Haw. at 531 (quoting *Smither & Co., Inc. v. Coles,* 242 F.2d 220 (D.C.Cir.), *cert. denied,* 354 U.S. 914, 77 S.Ct. 1299, 1 L.Ed.2d 1429 (1957))).

Accordingly, the three keystone principles of workers' compensation designed to eliminate court involvement are: (1) legal liability without relation to fault; (2) the presumption under HRS § 386–85 that the claim is for a covered work injury; and (3) the exclusiveness of remedy under HRS § 386–5.

As will be explained below, in my view, the majority's opinion today will do grave damage to these principles of workers' compensation.

## II. *The Co–Employee Immunity*

I begin my discussion by noting the general proposition that a tortfeasor co-employee enjoys the same full immunity provided to his or her employer.[1] Majority opinion at 7, 919 P.2d at 269–270.

Given the no-fault principle of workers' compensation, we must start with the clear understanding that this "socially-enforced

bargain" involves and extends to a tortfeasor co-employee. The majority recognized this workers' compensation principle when it quoted Professor Larson:

> The reason for the employer's immunity is the *quid pro quo* by which the employer gives up his [or her] normal defenses and assumes automatic liability, while the employee gives up his [or her] right to common-law verdicts. *This reasoning can be extended to the tortfeasor co[-]employee; he [or she], too, is involved in this compromise of rights.* Perhaps, so the argument runs, one of the things he [or she] is entitled to expect in return for what he [or she] has given up [*i.e.,* "normal defenses"] is freedom from common-law suits based on industrial accidents in which he [or she] is at fault.

2A Larson, *supra,* § 72.22, at 14–15 (emphasis and brackets added).

Accordingly, all parties involved in the workplace gave up something in return for immunity and certainty of an award. Thus, whether the injury is caused by the unintentional act of the employer, a co-employee, or by the injured employee's own unintentional conduct, *see* HRS § 386–3, this socially-enforced bargain provides a wall of separation where a claim for an injury arising out of and in the course of employment is exclusively in the workers' compensation arena. The majority's opinion today, however, seeks to introduce a "reckless" fault standard to a no-fault scheme, undermining this "wall of separation" principle. *Cf. Sato v. Tawata,* 79 Hawai'i 14, 897 P.2d 941 (1995) (Ramil, J., dissenting).

## III. *The No-fault Principle and the Deterrence Concept*

In an attempt to justify less than full immunity to co-employees, the majority claims, relying on the "punitive damages" principle, "that reckless conduct is capable of being deterred." *See* majority opinion at 8, 919 P.2d at 270. However, because workers'

---

1. Given the no-fault principle of workers' compensation and that negligent and reckless conduct could arguably mean the same thing, I submit that the majority's analysis is flawed. In order for the workers' compensation system to

work, it must be dictated by a fairly clear standard. "Gross negligence" or a reckless conduct standard, by its nature, are vague terms. Consequently, it will invite lawsuits, as Wyoming discovered.

compensation is a no-fault system, it is not designed to "punish the wrongdoer." The majority fails to recognize that deterrence and no-fault are concepts that are at the opposite ends of the spectrum. Thus, the majority's premise that the deterrence concept supports lawsuits between co-employees is simply wrong.

Rather, "punishing the wrongdoer" is accomplished within the internal disciplinary procedures of the employer. In this sense, an employer's disciplinary function plays a vital role in workers' compensation. *Cf. Wharton v. Hawaiian Electric Co., Inc.,* 80 Hawai'i 120, 906 P.2d 127 (1995) (holding that employee's stress injury solely due to disciplinary proceedings was not compensable under workers' compensation).

In addition, because our workers' compensation system is based on the no-fault principle, workplace safety is addressed by a separate statute. Employees like Iddings, concerned about workplace safety, can invoke the remedies available to them under HRS chapter 396. *See,* note 4, *infra.*

Accordingly, the majority's reliance on the concept of deterrence as the reason to allow lawsuits between co-employees is contrary to the no-fault principle of our workers' compensation system.

### IV. *The Plain Meaning Argument*

The majority, relying solely on cases decided by the Supreme Court of Iowa beginning with *Thompson v. Bohlken,* 312 N.W.2d 501 (Iowa 1981), holds its opinion together by the conclusion that the single term "wanton" includes reckless conduct.[2]

I believe that the majority's reliance on *Thompson, supra,* and its three-part test is misplaced. The court in *Thompson* interpreted Iowa Code § 85.20 (1977), the language of which is significantly different from the relevant language of HRS § 386–8. As discussed in part III.B.3 of the majority opinion, Iowa Code § 85.20 provides that workers' compensation constitutes the exclusive remedy for injuries caused by a co-employee, except where the injury is "caused by the other employee's *gross negligence* amounting to such lack of care as to amount to wanton neglect for the safety of another." (Emphases added.) HRS § 386–8, on the other hand, provides in relevant part that "[a]nother employee of the same employer shall not be relieved of his liability as a third party, if the personal injury is caused by his *wilful and wanton misconduct.*" (Emphasis and brackets added.)

The Wyoming Supreme Court discussed these differences in *Mayflower Restaurant Co. v. Griego,* 741 P.2d 1106 (Wyo.1987):

> Although degrees of negligence are not considered in comparative negligence, it must be remembered that the traditional concept of gross negligence visualized less culpable conduct than willful and wanton conduct. Gross negligence has been defined as:
>
> > Indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amounts of watchfulness and circumspection than the circumstances require of a person of ordinary prudence. But it is something less than the willful, wanton and reckless conduct.
>
> *Altman v. Aronson,* 231 Mass. 588, 121 N.E. 505, 506 (1919).

---

**2.** Referring to Black's Law Dictionary, 1142–43 (6th ed.1990), the term "reckless" is defined in pertinent part as "careless, heedless, inattentive.... According to circumstances, it may mean desperately heedless, wanton or willful, or it may mean only careless, inattentive or negligent." On the other hand, the same dictionary defines "reckless misconduct" in relevant part as follows: "a person is guilty of reckless misconduct when he intentionally does an act, or fails to do an act in violation of his duty, with knowledge of serious danger to others involved in it or of facts which would disclose such danger to a reasonable man."

As noted above, the term "reckless," depending on the circumstances, could have a different meaning. Thus, it does not have a "plain meaning."

Wilful and wanton misconduct is the *intentional* doing of an act, or an *intentional* failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another. *Weaver v. Mitchell,* 715 P.2d 1361, 1369–70 (1986) (citing *Danculovich v. Brown,* 593 P.2d 187 (Wyo.1979)).

*Mayflower Restaurant v. Griego,* 741 P.2d 1106, 1115 (Wyo.1987) (emphases added).

Because the *Thompson* court interpreted "wanton neglect" in relation to the "gross negligence" standard of the Iowa statute, in my view, the majority's reliance on *Thompson* to support the "plain meaning" argument is misplaced.

Moreover, the majority opinion, in invoking the "plain meaning" rule, stated that: (1) "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself"; (2) "our only duty is to give effect to the statute's plain and obvious meaning"; and (3) "in interpreting a statute, we give the words their common meaning, unless there is something in the statute requiring a different interpretation." Majority opinion at 7, 919 P.2d at 269.

Relying on Black's Law Dictionary (6th ed.1990), it defined "wanton" as "[r]eckless, heedless, malicious; characterized by extreme recklessness or foolhardiness; recklessly disregardful of the rights or safety of others or of consequences." Majority opinion at 7, 919 P.2d at 269. The opinion then proclaimed that the plain meaning of the term "wilful and wanton misconduct" encompasses reckless conduct. *Id.* I disagree.

First, the term "wanton" does not have a plain, obvious or common meaning. Indeed, the authority cited by the majority, *i.e.*, Black's Law Dictionary, contains at least six variations of the definition of "wanton." For example, the same dictionary defined, in pertinent part, "wanton injury" as an "[i]njury

produced by conscious and intentional wrongful act, or omission of known duty *with* reckless indifference to consequences." *Black's Law Dictionary,* 1582 (6th ed.1990) (citing *Rainey v. State,* 31 Ala.App. 271, 17 So.2d 683, 686 (1943)) (emphasis added). *See also Mayflower Restaurant, supra,* (defining "wilful and wanton misconduct" as an intentional act).

Second, the majority's definition of "wanton" came from a 1937 bankruptcy court decision involving the interpretation of "operat[ing][an] automobile upon [a] public highway in a wanton and reckless manner and with an utter disregard for the safety of others . . ., and under circumstances likely to cause great bodily injury" applied to "Section 17 of the Bankruptcy Act." *In re Wegner,* 88 F.2d 899, 900 (7th Cir.1937). This 1937 decision noted that "[t]he word 'reckless' has a wide range of meaning." *Id.* at 902. Thus, in my view, it is inappropriate to invoke the "plain meaning" rule to the term "wanton" when what it is supposed to mean, *i.e.*, "reckless," is also vague and ambiguous.

By interpreting the word "wanton" to include reckless conduct, which, in turn, arguably includes allowing "excessive furniture" in the work place, the majority fails to take into account the purpose of workers' compensation and the entire statutory scheme as discussed in part I, *supra.*

Under HRS § 386–8, a tortfeasor co-employee enjoys the same immunity as his or her employer if he or she is acting in the course of his or her employment. However, if the co-employee acts "as a third party" and "the personal injury is caused by his [or her] wilful and wanton misconduct," the co-employee is not immune from suit. The construction of HRS § 386–8 is consistent with the definition of "wanton injury" which requires: (1) a conscious and intentional wrongful act, or (2) an intentional failure to do an act, with reckless indifference to consequences. In other words, an employee's intentional wrongful act or an omission of a known duty that is further characterized with the willingness to injure others will be considered as actions of a "third party."[3]

---

**3.** Such intent is not limited to consequences that are desired. *See Thompson v. Forest,* 136 N.H. 215, 614 A.2d 1064 (1992).

In the present case, the first question is whether Dr. Mee–Lee committed a conscious and intentional wrongful act. In other words, in the workers' compensation context, whether his actions deviated from the normal duties of his employment. If so, the second question is whether the character of his actions displayed a willingness to injure others.

Here, Iddings filed her complaint against Dr. Mee–Lee in his capacity as "the Director of Psychiatry at [CMC]." The basis for the suit is "that excessive furniture within the Intensive Care Module posed a safety hazard." And, the allegations that Dr. Mee–Lee as the director "had the ability to control the patient population," and he failed "to take steps to provide for the safety" of employees like Iddings, are duties within the scope of his employment. Dr. Mee–Lee did not intentionally commit a wrongful act.[4] Because the work-related injury to Iddings provided immunity to CMC, Dr. Mee–Lee, because he is being sued in his capacity as Iddings' supervisor, should also enjoy the same immunity.

### V. The Clear and Convincing Standard of Proof

For reasons similar to those discussed in part IV, *supra*, I do not believe that the adoption of the clear and convincing standard of proof would alleviate our concerns of an increased abundance of co-employee litigation and the potential for stigmatic effects on a co-employee defendant's reputation. Because the term "wanton" itself, having at least six variations in its definition, is vague and ambiguous, *see* part IV, *supra*, I cannot fathom how the application of the clear and convincing standard of proof would "endow a factfinder's determination that a suit is based on wilful and wanton misconduct with a greater degree of certainty." *See* majority opinion at 13, 919 P.2d at 275.

Furthermore, I do not believe that such a standard would discourage injured employees from challenging their cases before the courts, in light of the legal community's, as well as the general public's, uncertainty with the definition of "wanton." In its opinion, the majority set forth numerous instances in which Hawai'i's appellate courts have implemented the clear and convincing standard of proof. However, the rules and definitions in which the courts have applied in each of the cases cited by the majority were plain, obvious, and/or unambiguous.[5] The term "wan-

If an actor knows that an injury is substantially certain to result from his act and he nevertheless completes the act, he is treated by the law as if he in fact desired to produce the injury. To constitute an intentional tort, the tortfeasor must have known that his conduct was *substantially certain* to result in injury.

> [T]he mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent. The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but *it is not an intentional wrong*. In such cases the distinction between intent and negligence obviously is a matter of degree. The line has been drawn by the courts at the point where the known danger ceases to be only a foreseeable risk which a reasonable person would avoid, and becomes in the mind of the actor a substantial certainty.

*Id.* 614 A.2d at 1067 (citations omitted and emphases added).

4. With respect to Iddings' allegation of unsafe working conditions at CMC, I note Hawai'i's Occupational Safety and Health Law affords Iddings a remedy. Under HRS § 396–8(b) (1993), entitled *Employee Responsibility and Rights*, an employee such as Iddings may file a complaint with the Department of Labor and Industrial Relations "and where reasonable grounds exist for the department to believe there may be a hazard, there shall be an inspection in response to the complaint." Furthermore, under HRS § 396–8(e), "[d]ischarge or discrimination against employees for exercising any right under this chapter is prohibited." This prohibition allows employees like Iddings to refuse to engage in unsafe practices. HRS § 396–8(e)(1)(B). In her affidavit, she alleges that she knew that an "unsafe physical environment existed within the Human Services Unit as a result of overcrowding." Indeed, "[f]or more than one year prior to [her] accident," Iddings knew of the alleged unsafe condition at her work. Yet, Iddings continued to work assuming the risk of her overcrowded work place. Accordingly, it is difficult to conclude that Dr. Mee Lee's action, or, more appropriately, his inaction, created a condition of obvious danger to his employees that it can be characterized as "wanton" or a willingness to injure his employees.

5. *See, e.g., Carr v. Strode,* 79 Hawai'i 475, 904 P.2d 489 (1995) (requiring clear and convincing evidence to overcome presumption of paternity); *State v. Miller,* 79 Hawai'i 194, 900 P.2d 770 (1995) (requiring clear and convincing evidence

ton" in HRS § 386–8, on the other hand, is not; I therefore must disagree with the court's use of the clear and convincing standard of proof.

## VI. The "Arising Out Of And In The Course Of Employment" Principle

Furthermore, consistent with the above-entitled principles, the structure of workers' compensation laws makes clear that co-employees are accorded full immunity by providing in their statutes, for example, the following similar language: "acting in the course of his [or her] employment," see HRS § 386–8, or "employees acting within the scope of their employment," see Wyo.Stat. § 27–14–104(a) (1991).[6]

First, I note that Professor Larson has identified only ten states (Hawai'i not one of

that the person is not likely to flee or pose a danger to the safety of any other person or the community if released); State v. Lopez, 78 Hawai'i 433, 896 P.2d 889 (1995) (requiring clear and convincing evidence that any evidence obtained in violation of article I, section 7, would inevitably have been discovered by lawful means before such evidence may be admitted); Cresencia v. Kim, 10 Haw.App. 461, 878 P.2d 725 (1994) (requiring clear and convincing evidence that the representations were false and that the defendant misrepresented and/or failed to inform the petitioner of the agreement status); Maria v. Freitas, 73 Haw. 266, 832 P.2d 259 (1992) (holding that a constructive trust will be imposed where the evidence is clear and convincing that one party will be unjustly enriched if allowed to retain the entire property); Office of Disciplinary Counsel v. Rapp, 70 Haw. 539, 777 P.2d 710 (1989) (requiring clear and convincing evidence of intentional violations, neglect, and an effort to mislead Disciplinary Counsel); Chan v. Chan, 7 Haw.App. 122, 748 P.2d 807 (1987) (requiring clear and convincing proof that the defendant had power to comply with order and failed to do so); Mehau v. Gannett Pacific Corp., 66 Haw. 133, 658 P.2d 312 (1983) (requiring clear and convincing proof of defamation); Woodruff v. Keale, 64 Haw. 85, 637 P.2d 760 (1981) (requiring clear and convincing evidence that the severance of the natural parent-child tie be in the child's best interest); Tanuvasa v. City and County of Honolulu, 2 Haw.App. 102, 626 P.2d 1175 (1981) (instructing the jury that malice must be shown by clear and convincing evidence); Boteilho v. Boteilho, 58 Haw. 40, 564 P.2d 144 (1977) (holding that if part performance is relied upon to remove the oral agreement from the operation of the statute of frauds, clear and convincing proof of performance in pursuance of the alleged agreement must be adduced by the party seeking to enforce it).

The other case cited by the majority, i.e., Calleon v. Miyagi, 76 Hawai'i 310, 876 P.2d 1278 (1994), does not even address the implementation of the clear and convincing standard in its opinion. Given the disposition of Calleon, the court held that the defendant's argument, i.e., the punitive damages awarded by the jury were not supported by clear and convincing evidence, was simply moot, and therefore the instant punitive damages award was vacated and remanded.

6. The [Wyoming] legislature soon realized that the "culpable" standard had failed to curb the abundance of co-employee litigation. In 1986, the legislature further amended article 10, section 4 to extend coverage of worker[s'] compensation, at the election of the employer, to all employment. That same year, the legislature codified this provision and further extended the employer's immunity to co-employees acting within the scope of their employment. The legislature had reestablished full co-employee immunity under Wyoming law.

Materi, supra, at 278–79 (emphasis added) (footnotes omitted).

Despite the legislature's extension of the employer's immunity to co-employees acting within the scope of their employment, the Wyoming Supreme Court in Mills v. Reynolds, 837 P.2d 48 (Wyo.1992), held that § 27–14–104(a) was unconstitutional for two reasons.

First, [the legislature] has taken the entire group of individuals who have suffered or who will suffer from the tortious conduct of others and carved out an exception, without express constitutional authority, for co-employees. Second, it has created a class of employees. Under the Act, employees who were involved in extrahazardous employments were automatically within the purview of the Act.... Employees who were not involved in extra-hazardous employment could have been subject to the provisions of the Act if their employers had elected to participate.... Given that only some employees were automatically covered by the Act and that the determination of whether employees not involved in extra-hazardous employment were covered by the Act was made by employers, we cannot concur that:

Because every worker in Wyoming now may receive an equal benefit under the act with respect to the protection afforded the co-employee, there seems no prospect of supporting the claim of a deprivation of equal protection.

Mills v. Reynolds, 807 P.2d [383,] 397 [ (Wyo. 1991) ] (emphasis added). The Act created classifications which treat similarly situated people differently.

Mills, 837 P.2d at 51 (brackets added). Cf. Thompson v. Forest, 136 N.H. 215, 614 A.2d 1064 (1992) (holding that the co-employee immunity provision in workers' compensation law was constitutional).

the ten) with "exceptions" that would allow co-employees to sue one another.[7] 2A Larson, *supra*, § 72.11 n.13.2. An example of a statute allowing an "exception" to full immunity can be found in Wyoming's workers' compensation law. The Wyoming statute, prior to the 1991 amendment that established full immunity to co-employees, provided in pertinent part: "The rights and remedies provided in this act ... are in lieu of all other rights and remedies against any employer ... or his employees acting within the scope of their employment *unless the employees are grossly negligent, ....*" 1975 Wyo. Sess. Laws, Ch. 149 § 1 (amended 1977). Thus, by the plain language, *i.e.*, "unless," and the construction of the phrase, Wyoming allowed suits against "grossly negligent" co-employees while they were acting within the scope of their employment.

As noted above, Professor Larson can only identify ten states that permit less than full immunity to co-employees. Although a majority of states have clarified that certain conducts are deemed to be outside the scope of employment, *see, e.g.*, Ariz. Const., art. 18, § 8 ("if the injury is the result of an act done by the employer or a person employed by the employer knowingly and purposely with the direct object of injuring another, and the act indicates a wilful disregard of the life, limb or bodily safety of employees[.]"); Cal. Labor Codes § 3601(a) (1971) ("wilful and unprovoked physical act[s] of aggression by another employee"); and W. Va.Code. Ann. § 23-2-6a (1973) ("deliberate intention," defined in section 23-4-2(c)(2)(i) as a "consciously, subjectively and deliberately formed intention to produce the specific result of injury or death to an employee"), these clarifications are not regarded as exceptions to full immunity. Furthermore, in my view, an intentional conduct to injure a co-employee, or an intent to injure one's employee, constitutes conduct outside the scope of employment.[8] *See* majority opinion at 19–20, 919 P.2d at 281–282.

Hawai'i's workers' compensation law, specifically the "Liability of third person" provision of HRS § 386–8, as found by Professor Larson, is consistent with the majority of states that provide full immunity to co-employees, *i.e.*, it provides immunity to employees "acting in the course of [their] employment." Also, similar to the majority of the states' laws, HRS § 386–8 clarifies that employees committing "wilful and wanton misconduct" are acting "as a third party." Unlike the Wyoming example above, Hawai'i's co-employee immunity provision does not indicate an exception by words such as "unless" or "except" or by its construction.

## VII. *Dr. Mee–Lee in His Capacity as a Supervisory Employee*

As discussed above, a regular employee is part of the "socially enforced bargain," and workers' compensation laws make clear that full immunity extends to co-employees if they are "acting in the course of [their] employment." In the present case, Dr. Mee–Lee is being sued because of his duties and responsibilities as the director of CMC. Given the obvious distinction between a regular employee and a supervisory employee,[9] *Simmons First Nat'l Bank v. Thompson*, 285 Ark. 275, 686 S.W.2d 415 (1985), provides us guidance on a supervisor's immunity from liability.

### 1.

In *Simmons*, a tort action was brought by injured employees and the personal representatives of two employees who died. *Id.* 686 S.W.2d at 416. The four defendants were supervisory employees of the company:

7. Those states that permit co-employees to sue one another include Alabama, Arkansas, Maryland, Minnesota, Missouri, New Hampshire, Rhode Island, South Dakota, Vermont, and Wyoming.

8. Accordingly, a person, whether a co-employee or the employer, who "orders the excavation of a large portion of the floor immediately outside a co-employee's office door on the second floor of a building, leaving a gaping hole to the floor below" and "orders the hole covered with paper-thin balsa wood" and severely injures an employee is guilty of an intentional act and should be criminally prosecuted.

9. For example, a foreman or foreperson is defined as a "[p]erson designated by employer-management to direct work of employees; superintendent; overseer." *Black's Law Dictionary*, 648 (6th ed.1990).

the mill manager, the pulp mill superintendent, the superintendent of engineering, and the supervisor of safety. *Id.* The complaint alleged that each defendant failed to discharge his or her responsibility to make the premises safe and thus wrongfully allowed chemicals to enter an open grate sewer covering that resulted in the creation of poisonous gas. *Id.* The supervisory employees moved for summary judgment. *Id.* The circuit court sustained the motion. *Id.* On appeal, appellants argued that, on the facts of this case, the supervisory employees should not be immune from liability for their own wrongdoing. *Id.* The Supreme Court of Arkansas disagreed and cited A. Larson, *Workmen's Compensation Law*, § 1.20 (1984), for support:

> The right to compensation benefits depends on one simple test: Was there a work-connected injury? Negligence, and for the most part, fault, are not in issue and cannot affect the result. Let the employer's conduct be flawless in its perfection, and let the employee's be abysmal in its clumsiness, rashness and ineptitude: if the accident arises out of and in the course of the employment, the employee receives his award. Reverse the positions, with a careless and stupid employer and a wholly innocent employee: the same award issues.
>
> Thus, *the test is not the relation of an individual's personal quality (fault) to an event, but the relationship of an event to an employment.* The essence of applying the test is not a matter of assessing blame, but of marking out boundaries.

*Simmons*, 686 S.W.2d at 417 (emphasis added). In harmony with Larson's conclusions, the *Simmons* court explained:

> As we all know, the purpose of workers' compensation statutes was to change the common law by shifting the burden of all work-related injuries from individual employers and employees to the consuming public. In that effort the matter of fault, as Larson points out, is ordinarily immaterial. Employers were compelled to give up the common-law defenses of contributory negligence, fellow servant,[10] and assumption of risk. Employees were compelled to give up the chance of recovering unlimited damages in fault-related cases in return for a certain recovery in *all* work-related cases. The plaintiffs here are attempting to return to the common-law system based on fault, when it is to their advantage to do so, but at the same time to retain the assured benefits of workers' compensation regardless of fault.

*Id.* 686 S.W.2d at 417–18 (emphasis in original).

The Missouri Court of Appeals in *State ex rel. Badami v. Gaertner*, 630 S.W.2d 175 (Mo.App.1982), gave a persuasive practical justification for this view:

> Under present day industrial operations, to impose upon executive officers or supervisory personnel personal liability for an accident arising from a condition at a place of employment which a jury may find to be unsafe would almost mandate that the employer provide indemnity to such employees.[11] That would effectively destroy the

---

**10.** Under the doctrine of respondeat superior, an employer generally is liable for injuries caused by the negligent acts of his employees. Significantly, pursuant to the fellow servant rule, an employer need not redress such injuries when the person harmed also is one of his employees. The import of this rule, which has been criticized as unjust by courts and commentators, has been diminished by workers' compensation and employers' liability laws. Matthew J. McMahon, *The Survey of New York Practice*, 56 St. John's L.Rev. 371, 389–90 (1982) (footnotes omitted).

**11.** In my view, the result would be another layer of insurance coverage for supervisory employees on top of workers' compensation paid for by

employers and, ultimately, the consuming public. Furthermore, it would be absurd to have the employer provide benefits to the injured employee through workers' compensation, and, at the same time, indemnity coverage to the supervisory employee. A typical situation where this absurd result would occur is the following: (1) the injured employee would seek workers' compensation, in addition to damages from the supervisory employee; (2) the supervisor would thereby seek indemnity from the employer; and, finally, (3) the employer would then seek reimbursement from the injured employee. As pointed out by the *Gaertner* court, this would effectively destroy the immunity provisions of the workers' compensation law.

immunity provisions of the workmen's compensation law.

*Simmons,* 686 S.W.2d at 417 (quoting *Gaertner,* 630 S.W.2d 175).

For the reasons above, the *Simmons* court held that because the employer, International Paper Company, was immune under the statutes from a failure to provide employees with a safe place to work, the same immunity protected the supervisory employees when their general duties involved the overseeing and discharging of that same responsibility. *Id.* (citing *Vaughn v. Jernigan,* 144 Ga.App. 745, 242 S.E.2d 482 (1978); *Kerrigan v. Errett,* 256 N.W.2d 394 (Iowa 1977); *Athas v. Hill,* 54 Md.App. 293, 458 A.2d 859 (1983); *Greco v. Farago,* 477 A.2d 98 (R.I.1984); and *Laffin v. Chemical Supply Co.,* 77 Wis.2d 353, 253 N.W.2d 51 (1977)). *See also Parker v. St. Louis County Water Co.,* 668 S.W.2d 182 (Mo.App.1984).

In the present case, at the time of Iddings' injury, Dr. Mee–Lee served as Director of Psychiatry at CMC and was in charge of the Human Services Unit. Being in charge of the Human Services Unit in which Iddings served as a nurse, Dr. Mee–Lee served as Iddings' supervisor. Thus, similar to *Simmons,* the present case involved a tort action brought by an injured employee against a supervisory employee for failing to discharge his responsibility to make the premises safe. Because CMC, the employer in the present case, is immune under HRS § 386–5 from an unintentional failure to provide employees with a safe place to work, the same immunity protects Dr. Mee–Lee who had the responsibility of overseeing and discharging that same responsibility.

2.

Moreover, the duty to provide a safe working environment is CMC's "nondelegable duty."

*Raulerson v. Roehr,* 511 So.2d 1027 (Fla. 2d DCA 1987), dealt with circumstances similar to that in the present case. In *Raulerson,* a machine shop employee was seriously injured when he was working with his super-

visors to repair a "tracked vehicle." *Id.* at 1029. The jury rendered a verdict against the supervisors. *Id.* at 1028. However, the trial court granted the supervisors' motion for directed verdict notwithstanding a jury verdict on the ground that workers' compensation was the injured employee's exclusive remedy. *Id.*

The appellate court affirmed the directed verdicts in the supervisors' favor and held that an injured employee was not entitled to pursue a civil action against his supervisors where there was no evidence that the supervisors were guilty of any misconduct beyond a mere failure to ensure that the employer's "nondelegable duty" to provide a safe working environment was discharged. *Id.* at 1030. It held that a corporate officer is subject to personal liability when he or she commits an affirmative act of negligence that goes beyond the scope of the nondelegable duty of the employer to provide his employees with a safe place to work. *Id.* at 1029 (citing *West v. Jessop,* 339 So.2d 1136 (Fla. 2d DCA 1976). The court explained:

The rule … was derived from a rule adopted by the Supreme Court of Wisconsin in *Kruse v. Schieve,* 61 Wis.2d 421, 213 N.W.2d 64 (1973). In commenting on a supervisor's liability to an employee, the Wisconsin court said:

Under what circumstances can a duty be owed to a fellow employee additional to and different from the duty of proper supervision that is owed to the employer by a corporate officer or supervisor/employee? Clearly *something extra* is needed over and beyond the duty owed the employer.[12]

*Id.* [213 N.W.2d] at 67 (emphasis supplied).

We emphasized this language in *Zurich Insurance Co. v. Scofi,* 366 So.2d 1193 (Fla. 2d DCA 1979), which involved the death of an employee working in a trench when a cave-in occurred. Damages were sought from the supervisor employed by the same company which employed the deceased worker. The supervisor was in charge at the job site. We found that there was nothing in the record of that

---

**12.** Under HRS § 386–8, "another employee of the employer acting in the course of his [or her] employment" is immune from suit as a third party.

case to indicate that the supervisor committed any affirmative act of negligence which went beyond the scope of his employer's duty to provide a safe place to work. We said "simply stated, the 'something extra' as required by *Kruse* was missing in the instant case."

Similarly, we find the "something extra" missing in the case now before us. We believe the trial judge was correct in ruling that the evidence presented at trial simply does not sustain a finding that the individual appellees were guilty of affirmative acts of negligence which went beyond the failure to perform the nondelegable duty of [the employer] to provide [the employee] with a safe place to work.

*Raulerson,* 511 So.2d at 1030.

In the present case, Iddings' complaint alleged, *inter alia,* that:

> 10. Prior to October 12, 1991, Defendant MEE–LEE had been advised that excessive furniture within the Intensive Care Module posed a safety hazard, but Defendant MEE–LEE *took no steps* to remove the furniture or to reduce the patient population within the Intensive Care Module.
>
> 11. Defendant had the ability to control the patient population, as was evidenced by the fact that he caused said population to be reduced to within authorized numbers in anticipation of a hospital accreditation inspection, and, again, in anticipation of an inspection by the State Department of Health.
>
> 12. The actions of Defendant MEE–LEE in *failing to take steps to provide for the safety of plaintiff IDDINGS* and other staff members who were required to work within the Intensive Care Module with individuals who often were hostile and/or violent constituted negligence and/or willful and wanton misconduct on the part of Defendant MEE–LEE.

(Emphases added). Dr. Mee–Lee's "taking no steps" or "failing" to provide for the safety of plaintiff Iddings by removing excessive furniture within the Intensive Care Module

does not go "beyond the scope of the nondelegable duty of the employer to provide his employees with a safe place to work" merely because he, as the Director of Psychiatry in charge of the Human Services Unit, "had the ability to control the patient population." Because safety in the workplace is a nondelegable duty of CMC, Dr. Mee–Lee did not commit "something extra" that is outside the "course of his employment." See HRS § 386–8. Indeed, Iddings' suit is premised on Dr. Mee–Lee's responsibility as the Director of Psychiatry in charge of the Human Services Unit and accordingly, within the course of his employment.

### VIII. *The Impact of this Decision*

Iddings contends that making it easier for injured employees to sue their co-employees will help in reducing the costs incurred by employers to purchase workers' compensation insurance. In my view, Iddings' contention is meritless. *See* note 11, *supra.* Furthermore, Iddings as well as the majority fail to consider the social costs of allowing the exclusive remedy provision to be easily circumvented by simply claiming that a supervising employee allowed an employee to work in an unsafe environment. In other words, employers in our state will now have to pay double, *i.e.,* (1) workers' compensation premiums and (2) liability insurance for their supervisors and employees, in exchange for their "immunity."

If we follow the majority's position, almost any claim for an on-the-job injury may be framed as a claim under HRS § 386–8 against a supervising employee for "wantonly" allowing the employee to work in an unsafe environment, *e.g.,* in this case, "excessive furniture" within the workplace. If it is not necessary to prove that the alleged wilful and wanton misconduct included an actual intent to cause injury, any time an employee is injured on work premises, the exclusive remedy provision can be easily circumvented.

It would seem ironic that a "reckless" 1937 bankruptcy ruling could have drastic consequences for Hawai'i. I note the concerns of the Alabama Legislature.[13] Wyoming, at

---

**13.** I do not claim to understand fully Alabama's exclusive remedy provision because it "provides

complete immunity to employers and limited immunity to officers, directors, agents servants or

least its state legislature, also learned the bitter and costly lesson that a fault standard cannot co-exist within a no-fault system:

> The court's decision also undermines the purpose of Worke[rs'] Compensation. Worker[s'] Compensation statutes were enacted not only to benefit employees, but also to insure employers against large judgments that might be awarded if employees were allowed to sue. However, with the elimination of co-employee immunity, employers are once again facing the possibility of paying out large sums of money to protect their workers. Many employees will now demand their employers to provide them with liability insurance as a condition of employment. The employer will be paying double for the immunity it supposedly received from worker[s'] compensation statutes. In addition, employers may be required to indemnify or defend their negligent employees. These increased demands will greatly increase costs to Wyoming employers. If employers refuse these demands, then the cost to Wyoming employees will be severe. Every time an employee makes a mistake on the job, he will be vulnerable to a costly lawsuit.
>
> The court's decision will also have serious, non-legal, ramifications. Currently, only ten states, including Wyoming, permit co-employees to sue one another. When a

business is deciding whether or not to locate in Wyoming, co-employee liability will be one of the factors taken into consideration. The added cost of insurance for its employees will encourage businesses to look at surrounding states such as Colorado, Nebraska, Utah, Idaho and Montana which provided immunity for businesses and their employees. Employer could achieve substantial savings by relocating in a state that provides them and their employees more protection from lawsuits. It could have a disastrous impact on Wyoming's already fragile economy if employers begin relocating.

> While Justice Urbigkit sought to "open the courthouse doors" to injured employees, the court has effectively opened a floodgate of litigation that will end up costing employers, employees, and the judicial system a lot of time and money. This, in turn, injures everyone through crowded court dockets, higher costs to employers, and higher prices for the consumer.

Materi, *supra*, at 287–88 (brackets added).

For these reasons, I respectfully dissent and would affirm the circuit court's order granting Dr. Mee–Lee's motion for summary judgment.

---

employees of the same employer ... from civil liability for all causes of action *except those based on willful conduct* and such immunity is an essential aspect of the workers' compensation scheme." However, the legislative findings and intent as to actions filed by an injured employee against a co-employee is also worth noting:

> The legislature finds that actions filed on behalf of injured employees against officer, directors, agents, servants or employees of the same employer seeking to recover damages in excess of amounts received or receivable from the employer under the workers' compensation statutes of this state and predicated upon claimed negligent or wanton conduct resulting in injuries arising out of and in the course of employment are contrary to the intent of the legislature in adopting a comprehensive workers' compensation scheme and are producing a debilitating and adverse effect upon efforts to retain existing, and to attract new industry to this state. Specifically, the existence of such causes of action places this state at a serious disadvantage in comparison to the existing

laws of other states with whom this state competes in seeking to attract and retain industrial operations which would provide better job opportunities and increased employment for people in this state. The existence of such causes of action, and the consequent litigation resulting therefrom, results in substantial cost and expenses to employers which, as a practical matter, must either procure additional liability insurance coverage for supervisory and management employees or fund the costs of defense, judgment or settlement from their own resources in order to retain competent and reliable personnel. The existence of such causes of action has a disruptive effect upon the relationship among employees and supervisory and management personnel. There is a total absence of any reliable evidence that the availability of such causes of action has resulted in any reduction of the number or severity of on-the-job accidents or of any substantial improvement on providing safe working conditions and work practices.

Ala.Code § 25–5–14 (1992).